(No. 68274.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JERRY WARD, Appellant.

*Opinion filed November 19, 1992.—Rehearing denied March 29, 1993.*

274

Randolph N. Stone and Rita A. Fry, Public Defenders, of Chicago (Vicki Rogers, Assistant Public Defender, of counsel), for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and Gael A. McCaughey-O'Brien, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

Following a jury trial in Cook County, defendant, Jerry Ward, was found guilty of the murder of Bruce Herd and Herd's girlfriend, Pamela Williams (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)), the armed robbery of Bruce Herd (Ill. Rev. Stat. 1983, ch. 38, par. 18—2(a)), and possession of a stolen motor vehicle (Ill. Rev. Stat. 1983, ch. 95½, par. 4—103(a)(1)). After the verdict was rendered, the court found the defendant eligible for the death penalty, since he was over the age of 18 at the time the offenses were committed, he committed two murders, and they were committed in the course of an armed robbery. After finding that there were insufficient mitigating factors to preclude the imposition of the death penalty, the defendant was sentenced to death, as well as to a 30-year term of imprisonment for the armed robbery, and three years' imprisonment for possession of a stolen motor vehicle. The death sentence was stayed (134 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603).

Concerning the guilt phase of the trial, defendant raises as issues whether: (1) the trial court erred in admitting into evidence a pair of undershorts alleged to be defendant's; (2) the court improperly admitted a police officer's testimony that brain matter was present on defendant's face and clothing; (3) the defendant was denied due process when the tissue matter on defendant was not preserved; (4) defendant was denied a fair and impartial trial by the prosecution's references to Wil-

liams and her family; (5) the admission of testimony that defendant was unemployed was prejudicial error; (6) the trial court abused its discretion in replacing an ill juror; (7) defendant was denied his right to present a defense when the court refused to grant a further continuance to locate defense witnesses; (8) defendant's statement regarding the offense of possession of a stolen motor vehicle should have been admitted under the completion doctrine; (9) defendant's statement regarding the offense of possession of a stolen motor vehicle should have been admitted as a declaration against penal interest; (10) the evidence was sufficient to prove that he committed two murders beyond a reasonable doubt; (11) defendant was denied effective assistance of counsel; (12) the prosecution made improper remarks during its closing argument; and (13) defendant's conviction for armed robbery should be vacated due to insufficient evidence.

Pertaining to his sentencing hearing, defendant raises as issues whether: (1) the State failed to prove that the offense of murder was committed in the course of an armed robbery; (2) defendant's prison record was improperly admitted and considered as an aggravating factor; (3) defendant should receive a new sentencing hearing since the court decided that death should be imposed because he would be a danger in prison; (4) the court denied defendant a fair death penalty hearing in allowing evidence of an unsubstantiated rape charge; (5) the judge failed to properly consider mitigating evidence concerning defendant's tragic family life; (6) the judge failed to consider defendant's criminal history as a mitigating factor; (7) the judge erroneously considered in aggravation the fact that Bruce Herd was immobilized and then executed, that Williams did not resist but was executed, and that defendant intended to kill; (8) the imposition of a death sentence in this case was excessive and inappropriate; and (9) the introduction of testimony that defend-

ant was a member of a gang at the sentencing hearing violated his constitutional right to free association.

Concerning the constitutionality of the Illinois death penalty statute, the defendant raises as issues whether: (1) the statute places a burden of proof on the defendant, precluding meaningful consideration of mitigation; and (2) the statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences.

The relevant facts are as follows. On February 15, 1986, in Chicago, the defendant allegedly shot Herd to death, beat Pamela Williams to death, and contemporaneously committed armed robbery by taking Herd's automobile. The evidence utilized by the State in the prosecution of defendant was primarily circumstantial, and was introduced through the testimony of numerous individuals. Where necessary, additional relevant facts will be discussed as each individual issue is discussed in depth.

Clara Herd Johnson testified that on February 15, 1986, her brother, Bruce Herd, came to her house between 6:30 and 7:30 p.m. with his cousin Larry. After about 10 minutes, Herd left her house with the keys to her 1977 Buick. Gerald Williams and Charles Williams testified that at some time between 7 and 8 p.m. Herd arrived at the apartment of his girlfriend, Pamela Williams, at 3910 W. Lexington. They remained at the apartment for a short time, then left saying they were going to the liquor store.

Curtis Rollins, who lived at 3837 W. Fillmore, testified that he was lying in bed sleeping on the night of the 15th when at about 9:20 p.m. he heard two gunshots. He looked out the window but could not see anything because a garage blocked his view. He also stated that at about 11 p.m. he went to the store and on his return he saw a body, which turned out to be Williams', lying in front of a garage in the alley.

Police officers Joseph Scardino, James Peck and James Summerville testified that they responded to a call of a man being dumped from a car. They went to the rear of 914 S. Independence between 9:30 and 9:35 p.m. At that location they saw a black male lying in the snow, with a gunshot wound to his skull, later identified as Bruce Herd.

Officer Scardino left the scene accompanied by his partner, Officer Prendkowski, and they drove around the area when he heard a description of the "suspect vehicle" as a gray Oldsmobile with the left rear bumper protruding from the car. While driving north on Springfield he saw a gray car traveling in the opposite direction. Scardino slowed down as the gray car drove through the intersection, and at this time, Scardino noticed that the car fit the description. After seeing the squad car, the driver sped away. Scardino then made a U-turn and followed the car south on Springfield and into an eastbound alley. At about 917 S. Springfield the car struck a building. Scardino stopped the squad car behind the gray vehicle as its tires were spinning on a patch of ice in an attempt to pull off. Scardino approached the car on the passenger side while Prendkowski approached on the driver's side. Defendant, who was driving the car, had his hands in the air, and as Prendkowski opened the driver's door, defendant reached into his waistband with his right hand and flipped a gun onto the front seat; he then raised his hands back into the air. Prendkowski pulled the driver out of the car and Scardino went around to assist in the arrest. The officers recovered a Smith and Wesson .38-caliber revolver, with two spent cartridges, from the front seat. Scardino testified that he saw a "red substance in the form of dots" as well as "white fleshy material or matter" on the car and on defendant's face and clothes. Then, over defense objec-

tion, he added that, based on his past experience, he believed the fleshy material to be brain matter.

Officers Peck and Summerville, responding to the call, arrived at 914 S. Springfield shortly after defendant had been handcuffed. Peck and Summerville stated that they also saw a red substance on defendant's face and on the front of his clothing along with "white flesh." They saw the same red substance and "white flesh" on the trunk and right rear quarter panel of the car. Defendant was arrested at about 9:50 p.m. and then was transported to the station, but no attempt was made by the police to preserve the "white fleshy matter."

Officer Hernandez testified that, at about 10:35 p.m. he went to the alley at 3824 W. Grenshaw where he saw a woman, later identified as Pam Williams, lying in the snow, with her head "bashed in." A tire jack and hat were also lying in the snow near the body.

After police evidence technician Frank DeMarco collected all of the physical evidence in this case, Pamela Fish, a serologist for the crime lab, did an analysis of the blood samples submitted. She examined defendant's clothing, as well as samples from the tire jack, the garage door, and the car trunk lid and right fender. All of the bloodstains were found to be consistent with the blood of Williams, but inconsistent with Herd's and defendant's blood.

Kathleen Galagan, a chemist in the crime lab, performed the gunshot residue analysis and determined that swabs taken from defendant's hands were consistent with his having recently discharged a handgun.

Edmond Donaghue, the deputy medical examiner, performed the autopsy on both Herd and Williams. When he examined Herd, he recovered a lead bullet from the front of his neck. He determined that the cause of death was a gunshot wound to the back of the head. The examination of Williams revealed 46 external in-

juries and 11 internal injuries. The external injuries were to the back of the head, the face, neck, and upper back areas. The cause of death was multiple injuries due to beating. Her injuries were such that brain matter would have been emitted.

James Gainer, a police officer and firearm expert, examined the gun and casings. He was unable to conclusively determine that the recovered bullet had been fired from the gun taken from defendant. However, Gainer was able to conclude that the bullet had been fired from a Smith and Wesson .38, the type of gun recovered from the defendant.

Theatrice Patterson, a latent print examiner, analyzed the prints taken from the exterior of the car and its contents. He determined that a print recovered from the exterior passenger window and from one of the plastic cups was made by defendant. One print recovered from a 7-Up can belonged to Williams and a print from a plastic cup and another from the 7-Up can belonged to Herd. There were no prints recovered from the gun or the tire iron.

After the State rested, the defense's motion for a directed verdict on the armed robbery was denied. Detective Warren Gavin was then called by the defense and he stated that he had interviewed Curtis Rollins on February 17, 1986, and that Rollins did not tell him that he had heard two shots fired at 9:20 p.m. on February 15th.

Defense counsel attempted to introduce defendant's statement made to police explaining how he had acquired the car, but the judge ruled such evidence not admissible. In his statement, the defendant indicated that he came upon the car, while it was running, with a gun on its seat, at the corner of Lexington and Springfield; that he got in on the passenger side, slid over and drove away.

Defense counsel then asked for a continuance to locate further witnesses. These witnesses would have allegedly testified as to defendant's presence elsewhere, and to the fact that they saw two black men remove the body of another black man from the car and drive away. The court granted a recess to locate the witnesses; however, they were able to locate only one witness, Jedd Davis, during the time allowed them. Consequently, defendant chose not to have Davis testify, but instead rested his case.

After the defense's motion for a mistrial based upon the State's closing argument, which the court denied, the case went to the jury. After deliberating, it returned guilty verdicts on the murder, armed robbery and possession of a stolen motor vehicle charges. Defendant waived his right to a jury for sentencing.

During the first stage of the sentencing hearing, the court found the defendant qualified for the death penalty because he was over the age of 18 at the time the offenses were committed, and because he had committed two murders during the course of an armed robbery.

During the second stage of the sentencing hearing, the State presented evidence in aggravation, while the defense presented mitigating evidence. The court found that there was no evidence of a struggle by the victims, which made the killings appear to be executions. The court further concluded that defendant's prior felony convictions indicated a propensity for violence. Moreover, the judge considered defendant to be a disciplinary problem in prison, having been found once with a knife while in the county jail, and on three separate occasions while in the Department of Corrections. The judge stated that he believed defendant is unable to assimilate into any society, citing specific incidents defendant had with guards in prison. In mitigation, defendant's brother and uncle testified that his conduct was the result of

striking back at society for the death of his mother and brother. After considering all of the evidence, the court found that death was an appropriate sentence for the defendant, and that there were no mitigating factors sufficient to preclude it. The judge also sentenced defendant to 30 years' imprisonment for the armed robbery and three years' for possession of a stolen motor vehicle. The court later denied a motion for a new sentencing hearing.

## TRIAL ISSUES

Defendant alleges that there were numerous errors committed by the court during his trial. First, he contends that the court erred when a State witness was allowed to testify as to the results of an analysis performed on a pair of defendant's bloodstained undershorts, which were later admitted into evidence, even though there was no foundation for such testimony because no witness identified them as belonging to the defendant.

It is the State's position that defendant has waived review of this issue, since he did not object to the testimony, or to the admission of the undershorts at trial, nor did he include this issue in his motion for a new trial. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) To properly preserve an issue for review, "[b]*oth* a trial objection *and* a written post-trial motion raising the issue are required." (Emphasis in original.) (*Enoch*, 122 Ill. 2d at 186.) Failure to do so operates as a waiver of the right to raise the issue on review. (*People v. Herrett* (1990), 137 Ill. 2d 195, 209.) There is no indication that defendant could not have objected to the introduction of this evidence at trial if he truly believed there to be a lack of foundation and that the evidence was unduly prejudicial to him.

Notwithstanding his failure to raise an objection at trial, the defendant responds that, due to the nature of the harm inflicted upon him by this evidence, this court should review this issue as plain error under Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)). The plain error doctrine may be invoked in criminal cases to review an error which has not been properly preserved for review (1) where the evidence is closely balanced, or (2) where the error is of such magnitude that the defendant was denied a fair trial. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.) The plain error rule guards against the "possibility that an innocent person may have been convicted due to some error which is obvious from the record, but not properly preserved." *Carlson*, 79 Ill. 2d at 576.

Defendant, relying upon *People v. Rogers* (1976), 42 Ill. App. 3d 499, contends that the second prong of the plain error rule has been satisfied here, since admitting this evidence without a proper foundation was so prejudicial that it deprived him of a fair trial. However, *Rogers* does not focus on the concept of plain error, which is at issue here. Furthermore, the court in *Rogers* held that the lack of a foundation constituted reversible error primarily because of certain prosecutorial comments which magnified the error by stressing the importance of the contested evidence. In the case at hand, there is no evidence that the State stressed the importance of the undershorts over that of the bloodstained pants and jacket.

In the case at bar, the serologist, Pamela Fish, examined what was represented to her as defendant's jacket, pants, and undershorts. She testified as to each article, concluding that the bloodstains on each were consistent only with Williams', but not defendant's or Herd's, blood type. Consequently, although the undershorts provide relevant evidence, their individual significance is greatly diminished because the jacket and pants worn by defend-

ant (the admission of which is not challenged), on the night of the alleged murder, provide substantially similar evidence.

Further, there was a stipulation between the parties, which provided that if Detective Sherry were to be called as a witness, he would testify that People's Exhibit No. 27 was "the undershorts that defendant was wearing at the time." It was further stipulated that he delivered defendant's undershorts to crime lab technician DeMarco for analysis. Although DeMarco's testimony conflicted with the stipulation, any contradiction simply goes to the weight of the testimony.

As a result of the stipulation by defendant's attorney, as well as the other noncontested substantially identical evidence, we do not believe that the testimony regarding, and the admission of, the undershorts deprived the defendant of a fair trial. We conclude that this is not an appropriate case for application of the plain error rule.

Defendant's next allegation of error is that Officer Scardino was improperly allowed to testify that when Jerry Ward was arrested he had brain matter on his face and clothing. Defendant contends that this testimony should not have been allowed since the State did not establish that the officer was qualified as an expert in determining the presence of brain matter.

Although there were numerous references made to "white fleshy material or matter" on defendant's face, clothing and car (none of which is now contested), there appears to be only a single reference to the substance in question as "brain matter," as evidenced by the following excerpt:

"Q. [Assistant State's Attorney Brogan]: Just to make one thing clear, you have testified that the defendant had what appeared to you to be blood and also this fleshy material, is that correct?

A. [Detective Scardino]: That is correct.

Q. Did you testify that it appeared that you saw that on the face of the defendant?

A. When we were at the vehicle, I saw what I believed to be—there were red splatter marks on his face and on his body, on his throat, clothing in the front. I believed it to be blood, yes.

Q. Had you ever seen anything like that white fleshy material before in your duties as a Chicago Police officer?

A. When someone is shot in the head and their brain matter was splattered on the wall in the adjacent area, it looked quite like that.

MR. SMITH: Objection.

THE COURT: I will sustain the objection to that description. It's stricken from the record. The [jury] is asked to disregard it."

It is clear that nonexperts may testify to the nature of substances observed by them with which they are familiar, and that testimony is not limited to a statement of the detailed characteristics observed, but may take the form of a conclusion as to what the substance was. (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §701.5, at 488-89 (5th ed. 1990).) Here, the witness testified that he was familiar with brain matter from his prior experience, and, based on his prior experience, he concluded that the white fleshy matter looked like it. He did not give an "expert opinion" as to the nature of the tissue, nor at any time did the State proffer Scardino as an expert. As a result, this was entirely proper testimony.

Most importantly, and regardless of the propriety of the contested testimony, it is a fact that the defendant successfully objected to Detective Scardino's reference to brain matter. After the judge sustained the objection, he then immediately admonished the jury to disregard that comment. Further, the jury was instructed under Illinois Pattern Jury Instructions, Criminal, No. 1.01 (2d ed. 1981) to disregard any testimony to which an objection

had been sustained, or that it had been admonished to disregard. Although the prejudicial effect of improper testimony cannot always be erased from the minds of the jurors by an admonishment from the court, the act of promptly sustaining the objection and instructing the jury to disregard such statement has usually been viewed as sufficient to cure any prejudice. (*Carlson*, 79 Ill. 2d at 577; *People v. Baptist* (1979), 76 Ill. 2d 19, 30.) We do not find any reason to suppose that the court's rulings were ineffective in this case. Thus, as a result of the precautions taken by the judge, any possible error was negated.

Defendant next contends that the court erred by allowing the police officers to testify about seeing the brain matter on defendant since they failed to preserve that evidence. He argues that the police could have preserved the evidence by either taking photographs of him or by taking samples from his face or clothing. According to the defendant, the failure of the police to do so denied him his right to have access to material evidence, and as a result, he claims that he was deprived of his constitutional right to due process and a fair trial.

Commencing with *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, there has been a succession of United States Supreme Court cases dealing with a defendant's constitutionally guaranteed right of access to evidence. Initially, in *Brady*, the Court held that in a State criminal case, the prosecution's suppression of material evidence favorable to, and requested by, the defendant, violates the due process clause of the fourteenth amendment, irrespective of the good faith or bad faith of the prosecution. (*Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97.) Subsequently, in *United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392, the Court expanded *Brady*, holding that the prosecution had a duty to *voluntarily* disclose

any exculpatory evidence that creates a reasonable doubt about defendant's guilt. The next significant case in this area was *California v. Trombetta* (1984), 467 U.S. 479, 81 L. Ed. 2d 413, 104 S. Ct. 2528, wherein the Court limited the State's duty to preserve evidence to that which might be expected to play a significant role in the suspect's defense. Finally, in *Arizona v. Youngblood* (1988), 488 U.S. 51, 102 L. Ed. 2d 281, 109 S. Ct. 333, the Court further limited the State's obligation by holding that unless the criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

In *Youngblood*, the Court indicated that it did not want to impose "on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it ***." *Youngblood*, 488 U.S. at 58, 102 L. Ed. 2d at 289, 109 S. Ct. at 337.

In this case, the police's failure to preserve the "white fleshy matter" can at worst be described as negligent. There was nothing offered by the defendant, other than mere speculation, evidencing bad faith on the part of the police. At the time of defendant's arrest, Williams' body (from whom the brain matter apparently originated) had not yet been found. Only Herd's, who had been shot once at the base of the skull, had been recovered. However, no brain matter was found either on his body or where his body had been dumped. Consequently, the officers had no known tissue with which to compare the tissue which was found on defendant and

the car. Consequently, no due process violation occurred because there was no evidence presented which demonstrated bad faith on the part of the police.

The defendant next argues that he was denied a fair and impartial trial as a result of the prosecution's introduction into evidence of irrelevant and prejudicial factors concerning Williams and her family. Defendant specifically points to the testimony of Williams' father and brother, as support for his allegation.

Williams' father, Gerald, testified that his daughter was 25 years old at the time of her death; that she worked part-time; that she had dated Herd for approximately two years; that she had two children; that she lived with her parents and their other children; that on February 15, 1986, she was preparing a special dinner for Gerald's birthday party which was to be held the next day; and that when Herd came over that evening, at about 8 p.m., she went with him to the store to purchase some beer for his birthday.

After the State had called Gerald Williams to testify as a life and death witness, Pam's brother, Charles Williams, was called as a witness. He testified that he saw his sister on that same day in his parents' apartment, and that they were preparing to celebrate their father's birthday. He stated that he had let Herd into the apartment some time after 7 p.m., and that Herd and his sister went to the store to get Gerald some beer for his birthday.

The defendant points out that the State then elicited the following prejudicial testimony from Charles:

"Q. [Assistant State's Attorney Schultz]: Did you leave the apartment at some time?

A. [Charles Williams]: I left the apartment about 11:30.

Q. And after leaveing [sic] the apartment did you then at some point come back to the apartment?

A. Yes, after I was called and told my sister was dead.

Q. When did you receive that phone call?

A. About a quarter to 2:00.

Q. What did you do when you got the phone call?

A. When I got the phone call, I questioned my brother in law [*sic*].

Q. He is the person that called?

A. Yes, Then [*sic*] I hung up.

Q. Then what did you do?

A. Then I sat on the bedside for awhile and I called back to make sure. And I questioned him again.

Q. What did you do after you have digested that had [*sic*] information?

A. Then I informed my wife.

Q. At some point did you leave the apartment?

A. About 40 minutes lateer [*sic*].

Q. Where did you go?

A. I went on up Madison and Racine and told one of my friends.

Q. Did you have a chance to see Pamela again at some point?

A. Yes, down at the corner.

Q. At that time was she dead?

A. Yes, she was dead."

The defendant contends that there was no legitimate reason to call the brother as a witness since the father had already testified as a life and death witness. He argues that the only purpose served by the victim's brother's testimony was to make the jury aware that Williams had family members who were affected by her death. As correctly pointed out by the defendant, "[t]his court has previously condemned prosecutorial efforts to present otherwise irrelevant information about a crime victim's personal traits or familial relationships as material evidence in a criminal case." (*People v. Jimerson* (1989), 127 Ill. 2d 12, 41; accord *People v. Hope* (1986), 116 Ill. 2d 265, 275.) In *Hope*, however, the court emphasized

that every mention of the decedent's family does not *per se* entitle the defendant to a new trial. Rather, the court must consider the manner in which the references to the murder victim's family came about. *Hope*, 116 Ill. 2d at 276-78.

The facts here are very similar to those in *Jimerson*, 127 Ill. 2d 12. As in *Jimerson*, the defendant failed to object to this testimony at trial and he failed to raise this point in his motion for a new trial. Consequently, defendant has waived this issue for review. *Enoch*, 122 Ill. 2d 176.

Furthermore, we do not believe that the admission of this testimony constitutes plain error. Applying the two-prong test referred to previously in *Carlson*, 79 Ill. 2d at 576-77, we first conclude that the evidence is not closely balanced. Defendant was arrested after a police chase, in the victim's car. This occurred very shortly after two gunshot sounds were heard and Herd's body was discovered. He had white fleshy matter and blood on his face and clothing. The blood makeup was consistent with Williams' blood. The arresting officer saw defendant remove a .38 Smith and Wesson gun from his waistband, which had two spent cartridges and bullets which were "non-factory." Gun residue tests proved that defendant had recently fired a gun. The bullet recovered from Herd was a "non-factory" bullet fired from a gun with characteristics consistent with the gun recovered from the defendant. Witnesses identified the car defendant was driving as the one that "dumped" Herd's body shortly before defendant's arrest. Additionally, the second prong of the plain error test was not satisfied, as any error here is not of such a magnitude as to deprive defendant of a fair trial.

In *Jimerson*, the bulk of the information complained of was relevant and admissible, or else was elicited from the witnesses in an incidental, nonprejudicial manner.

That was also the situation here, as the alleged improper testimony consumed a very insignificant portion of the many hours of argument and testimony during the trial. At no time during the guilt phase of the trial did the prosecution dwell upon the victim's family's relationship with her, their reaction to her murder, or its lasting effect upon them.

Some reference to the victim's family during the trial was necessary and inevitable to explain the circumstances of the crime. (See *People v. Hayes* (1990), 139 Ill. 2d 89, 142.) Much of the testimony in question here merely provided background factual information, and set the stage for the period leading up to the alleged murders. Much of Charles' testimony as to how he discovered his sister's death appears to have been volunteered by him, and was elicited incidentally, as the prosecutor was apparently attempting to obtain testimony that he identified Pam's body at the scene. We do not discern here a calculated effort by the prosecution to present this information or material as evidence bearing on defendant's guilt or innocence. (See *People v. Free* (1983), 94 Ill. 2d 378, 413-15.) Therefore, we hold that the references to the victim's familial relationships were not so prejudicial as to deprive the defendant of a fair trial.

Defendant next contends that reversible error occurred when a witness testified that defendant was unemployed. Officer Scardino testified to the following conversation he had with the defendant at the police station:

"Q. [Assistant State's Attorney Brogan]: Approximately [at] what time did you have that conversation?

A. [Officer Scardino]: I would say somewhere around, maybe, 10:15.

Q. Did you have occasion to ask the defendant his address?

A. Yes, sir.

Q. And what did he reply?

A. He told me that he resided at 105 South Ashland in the City of Chicago, County of Cook.

Q. And did you have occasion to ask the defendant whether or not he was employed?

A. Yes, sir. And he stated to me that he was not employed."

Defendant argues that by establishing that he did not live in the neighborhood and that he had no job, the State was allowed to imply to the jury that the defendant came into the neighborhood to make money the only way he could, by robbing and killing people. He further alleges that this evidence had no tendency to prove the offenses, but only served to cause the jury to believe that he was a bad person and hence likely to be guilty of the charged offenses.

Defendant again failed to object at trial to this testimony and he failed to raise this issue in his motion for a new trial. Consequently, defendant has not preserved this issue for review. (*Enoch*, 122 Ill. 2d 176.) Nevertheless, defendant argues that the admission of this particular evidence constituted plain error because it substantially affected his right to a fair trial. We disagree.

While defendant contends that the fact of his unemployment was used to imply that he was guilty, the State submits that his unemployed status, coupled with the location of his residence, was elicited only to challenge any potential evidence that defendant's presence in the area could be accounted for. However, this testimony could realistically lead one to either of the two conclusions put forth by the parties. This line of questioning was isolated and very brief, was not closely related to other surrounding testimony, and there was nothing said during the State's closing argument which associated his unemployment status with the propensity to commit these

crimes. Consequently, we find that the defendant was not so prejudiced by the admission of this testimony as to deny him a fair trial; therefore, this alleged error does not amount to plain error.

Defendant next maintains that the court's refusal to grant a continuance when one of the jurors became ill was an abuse of discretion that denied him a fair trial and due process. On the third day of trial and the second day of testimony, juror Vercie Williamson became ill. Defense counsel asked that the court adjourn for the day to allow Williamson a chance to recover and return the next day, since the defendant indicated that he was not happy with the selection of the first alternate juror. The State then indicated that it would agree to switch the order of the alternates so that the second alternate would replace Williamson. The court dismissed Williamson, and defense counsel's motion for a mistrial was denied. After some discussion, Williamson was replaced by the second alternate. Defendant now argues that he was denied his right to a fair trial and due process, since the "placement of the alternate on the jury resulted in a verdict against him by a tribunal not of his expressed choosing."

As correctly noted by the defendant, after a trial has begun, a reasonably brief continuance may be granted to either side in the interest of justice. (Ill. Rev. Stat. 1983, ch. 38, par. 114—4(f).) However, the request for a continuance is within the sound discretion of the trial court, and a failure to grant one will be reversed on review only when it is shown that the trial court abused its discretion and the refusal somehow prejudiced the defendant. *People v. Wilson* (1963), 29 Ill. 2d 82, 91-92.

Here, after the judge stopped the trial for the third time due to her illness, Williamson told the judge that she was feeling light-headed and might still have the flu; that she was not able to concentrate at all; that she was having hot flashes; that she had missed some of the tes-

timony because of the way she was feeling; and that she expressed doubt that her condition would improve by the following day. The record firmly established that the trial court properly ascertained that the juror could not perform her functions, that the juror was ill, that she had lost her ability to concentrate, and that she had not been able to absorb testimony. Accordingly, the trial court wisely used its discretion and assigned an alternate to the jury. It is ridiculous to contend that the court abused its discretion when an alternate was substituted for an ill juror because the defendant did not care for the alternate as much as the original juror. The defendant, who had his opportunity during *voir dire* to challenge any juror he considered unacceptable (limited, of course, by the number of peremptory challenges granted to each side), does not demonstrate prejudice when a juror who was properly chosen as an alternative, but is now considered undesirable, sits on his jury. There must be some definite showing of prejudice. Clearly, the court acted in a manner to best preserve the defendant's right to a fair trial by dismissing Williamson and replacing her with the alternate. Defendant has not demonstrated to this court that he was prejudiced by this replacement. The defendant has no constitutional right to a "tribunal of his own choosing," as he claims, but only the right to an impartial jury (Ill. Const. 1970, art. I, §8), chosen through a joint effort of both parties in compliance with the statutory requirements. (See Ill. Rev. Stat. 1983, ch. 78, pars. 20 through 23; Ill. Rev. Stat. 1983, ch. 38, par. 115—4.) Accordingly, defendant was not denied a fair trial or due process as a result of the court's refusal to grant a continuance to see if Williamson would recover by the next day.

Defendant next contends that he was denied both his right to present a defense and his right to testify, when the court refused to grant him a continuance to locate

certain defense witnesses. During the trial, defense counsel told the court that he had sent an investigator out to serve subpoenas on certain witnesses to appear the following day. The next day, defense counsel asked the court for a continuance to locate five witnesses since his investigator was only able to serve one subpoena, that being on Charles Houston (who failed to show). One witness, William Rankin, refused the subpoena, and the other three, Benjamin Smith, Jedd Lee Davis, and Stanley Miller, could not be found.

The court stated that it would not grant a continuance to the defendant in the hopes of his finding any of these witnesses, especially since their testimony was only speculative. However, the court did grant a 10-minute recess for counsel to confer with defendant as to whether or not he would testify. During the recess, Jedd Lee Davis appeared and said that he knew the address of the father of Stanley Miller, one of the missing witnesses. Defense counsel again requested a continuance until the next day, in order to locate Miller.

After the State objected to the motion for a continuance, the court agreed to grant a one-hour and 20-minute recess, to allow defense counsel time to find Miller. Defense counsel returned and indicated that he could not locate Miller, and he informed the court that he would not present Davis as a witness without Miller. Consequently, he had no more evidence to offer. Then, defendant informed the court that he would only testify if his witnesses did, and he complained that he was not allowed sufficient time to gather his witnesses.

The judge stated that he was not convinced, from the information he had, that those witnesses would be able to provide defendant with a defense. Therefore, the judge denied the defendant's request for an additional continuance.

Defense counsel stated that of the individuals he was trying to locate, two were alibi witnesses and one was an occurrence witness. One alibi witness, Jedd Davis, did eventually appear that day, but according to defendant, his testimony alone would not sufficiently cover the time period in question. A police report which the court reviewed indicated that the other alibi witness, Stanley Miller, told the police that he remembers seeing defendant on the "14th or 15th" on Pulaski and Arthington with other individuals, but that he did not give a time. The occurrence witness, Charles Houston, gave a statement to the police that at approximately 9:30 p.m. on February 15, 1986, he saw two individuals in a parked car, located in a vacant parking lot at 3830 Taylor Street. He further stated that he observed one of those individuals, a black male, take the body of another black male out of the auto and place it on the ground. He then got back into the car and drove away slowly. He could not identify either of the two individuals in the car, but he did identify the abandoned body as Herd's.

The defendant correctly notes that a motion for a continuance may be granted when a material witness is unavailable and the defense will be prejudiced by the absence of his testimony (Ill. Rev. Stat. 1983, ch. 38, par. 114—4(b)(3)). The granting of the motion, however, is within the sound discretion of the trial court, and its ruling will not be reversed on appeal in the absence of a clear abuse of that discretion. (*People v. Collins* (1985), 106 Ill. 2d 237, 281.) In reviewing the denial of a request for a continuance sought to secure the presence of a witness, the factors to be considered are: (1) whether defendant was diligent; (2) whether defendant has shown that the testimony was material and might have affected the jury's verdict; and (3) whether defendant was prejudiced. *People v. Boland* (1990), 205 Ill. App. 3d 1009, 1013.

Here, the defendant argues that the court abused its discretion by refusing to grant the motion for a continuance, and in doing so, violated defendant's right to present a defense, his right to testify on his own behalf, and his right to due process. In support of his position, the defendant argues that a continuance should have been granted so that these witnesses could have been procured. He alleges that their testimony would have been relevant because no exact time was established as to when the offenses occurred, only that it was probably after 8 p.m. and before 9:30 p.m. He further argues that Miller's and Davis' testimony would have established a reason for the defendant's presence in the area, that being that he had friends in the neighborhood. Also, Houston's testimony would have shown that someone else might have committed the murders, because Houston saw two individuals, while only the defendant was found in the car by police.

The State, on the other hand, replies that this motion was properly denied, contending that the defendant has not shown a clear abuse of discretion by the court, nor has he shown that his defense was prejudiced, both requirements for reversal. The State contends that the record proves that these witnesses were not alibi witnesses as alleged by the defendant at trial, nor was the verdict affected by their absence.

At the time of defendant's request for the continuance, he sought the testimony of three individuals whom he claimed he was with at the time of the murders: Davis, Rankin, and Miller. Rankin refused defendant's subpoena to appear as his witness, and the defendant did not seek a warrant or aid from the court to compel his appearance. Davis was present, in court, but defendant chose not to have him testify. Defense counsel represented to the court that Davis was not going to cover the time period of the homicide, despite the fact he had

told the court hours before Davis showed up that he was an alibi witness. As for both Miller and Rankin, there was no evidence which corroborated defendant's assertion that these witnesses were able to provide defendant with an alibi. Miller told Officers Cornelison and Thomas that he was in a car, drinking with Davis, Rankin and Burton, on either the "14th or 15th," and that defendant then walked by and joined them. However, both Davis and Miller acknowledged that (according to the belief of Officer Switski, who had interviewed Miller) this incident was not at the time of the murder. Defendant did not show to the trial court that this "potential testimony" was relevant in establishing defendant's whereabouts at the time of the murders. Accordingly, we conclude that the trial court did not abuse its discretion when it denied defendant's request for a continuance.

Furthermore, we reject defendant's argument that he was deprived of the right to testify on his own behalf as a result of the court's ruling. His failure to testify was his own choice, presumably a strategic one. Additionally, defendant claims that he was denied his constitutional right to present his own witnesses to establish a defense. This is not so. The court never refused to allow defendant to call any witnesses. If his witnesses would have been available, presumably they would have been allowed to testify. It appears that defendant was less than diligent in sending out an investigator to try to locate the five witnesses only one day prior to their scheduled testimony.

Defendant also urges that Miller and Davis should have been allowed to testify to establish a reason for defendant's presence in the neighborhood. Defendant overlooks the fact that Davis was present, in court, pursuant to a subpoena, and could have testified to their drinking together on the 14th or 15th, but defense counsel chose not to call him. Thus, defendant cannot now

claim he was prejudiced on this basis. Consequently, we find that defendant was not denied his right to present a defense, to testify on his own behalf, or to due process.

Defendant's next allegation of error is that the court refused to allow into evidence that portion of his statement to the police regarding his possession of the stolen vehicle. Shortly after the defendant was arrested, he was interviewed by the police. A portion of that interview was elicited through the direct examination of Officer Scardino, as follows:

"[Assistant State's Attorney Brogan]: At some point did you have occasion to have a conversation with this defendant?

[Officer Scardino]: Yes, sir.

Q. And where did that conversation take place?

A. In the interview room at the detectives—on the second floor with the detectives.

Q. And besides yourself and the defendant, do you recall if anyone else was present?

A. My partner Officer Prendkowski was there.

Q. Approximately what time did you have that conversation?

A. I would say somewhere around, maybe, 10:15.

Q. Did you have an occasion to ask the defendant his address?

A. Yes, sir.

Q. And what did he reply?

A. He told me that he resided at 105 South Ashland in the City of Chicago, County of Cook.

Q. And did you have occasion to ask the defendant whether or not he was employed?

A. Yes, sir. And he stated to me that he was not employed."

In addition to this portion of the conversation, as testified to by the State's witness, the defendant made additional statements to the police at that time; however, they were not elicited by the State during direct examination, and the court did not allow defense counsel to

cross-examine the witness as to those statements. According to the defendant, he had told the police the following: that he saw the car at the corner of Lexington and Springfield with the motor running and a gun on the seat; that he got in on the passenger side, slid over and drove away; that he saw the police make a U-turn and, as a result, he hit a fence and wall; that he got blood on his clothes when he stopped to urinate prior to being stopped by the police; that if he had killed the victims he would have done it in one place; that he touched the gun but did not fire it; and that he was in the car for only 5 to 10 minutes.

Under the "completion doctrine," when a portion of a conversation is related by a witness, the opposing party has a right to bring out the remainder of that conversation to prevent the trier of fact from being misled. (*People v. Weaver* (1982), 92 Ill. 2d 545, 556-57.) The defendant argues that as a result of *Weaver*, he should have been able to elicit the remainder of the interview of the defendant by the police. The failure of the court to allow this testimony, according to the defendant, denied him his right to a fair trial and due process of law.

The State, on the other hand, relies on *People v. Olinger* (1986), 112 Ill. 2d 324, which is distinguishable from *Weaver* and similar to the facts in the instant case. In *Olinger*, as in this case, the State introduced a portion of defendant's statement, and the defendant was precluded from bringing out the remainder. The court in *Olinger* noted that the defendant attempted to introduce his own exculpatory statements without having to take the stand and face impeachment. That court ruled that "[a] defendant has no right to introduce portions of a statement which are not necessary to enable the jury to properly evaluate the portions introduced by the State." *Olinger*, 112 Ill. 2d at 338.

We agree with the State that Officer Scardino's testimony as to defendant's address and employment was not misleading, and that defendant's additional testimony as to his actions with regard to the automobile was not necessary to enable the jury to properly evaluate the elicited testimony. Further, the "admission of evidence under this doctrine is limited to that which is relevant, material, and *concerns the same subject* at the same time." (Emphasis added.) *People v. Barlow* (1989), 188 Ill. App. 3d 393, 411; *People v. Pietryzk* (1987), 153 Ill. App. 3d 428, 438.

In the present case, the excluded testimony did not concern the defendant's address and employment status. Rather, defendant simply wanted to introduce his exculpatory statement without having to take the stand and face impeachment. As such, the court's ruling in precluding defendant from presenting his version as to how and why he came into possession of the car was not erroneous.

Defendant attempts to distinguish this case from *Olinger* by claiming that this excluded testimony is not exculpatory at all, but is inculpatory, since he is admitting to the possession of a stolen motor vehicle, a crime of which he was eventually convicted. However, this attempt fails, even though the excluded testimony could have led to his conviction on this charge, since its primary purpose for being introduced was to prove that defendant did not commit the more serious crime, namely the murder of the two victims. Consequently, we find that defendant was not denied his right to a fair trial or due process of law as a result of the judge's action here.

Defendant next asserts that his statement to the police regarding his possession of the stolen automobile should have been admitted under the "[s]tatement (or declaration) against interest" exception to the hearsay

rule. Defendant claims that the failure of the court to admit his statement into evidence denied him his right to due process, to a fair trial, and to present a defense.

We conclude that this argument is without merit since this exception to the hearsay rule is simply not meant to apply to the statement of a *party*.

> "The assumption that people do not make false statements damaging to themselves furnishes the basis for the hearsay exception admitting declarations against interest. *Such a statement will be that of a nonparty*, for if the statement is that of a party, offered by her opponent, it comes in as an admission \*\*\*." (Emphasis added.) M. Graham, Cleary & Graham's Handbook of Illinois Evidence §804.7, at 695 (5th ed. 1990).

Although some judicial opinions fail to distinguish the declaration against interest exception to the hearsay rule from admissions, there is a clear line between the two evidentiary principles. While admissions relate to statements of a party, declarations against interest relate to statements of a nonparty. (See *People v. Berry* (1988), 172 Ill. App. 3d 256, 261.) Consequently, we find that the trial court's decision with regard to this issue is correct, as the defendant's statement, admitting his possession of the stolen vehicle, does not fall under the declaration against interest exception to the hearsay rule.

Assuming, *arguendo*, that defendant had been a nonparty, his statements would still not have been admissible, as his post-arrest statements were not offered by him as a declaration *against his interest*, but rather, were offered to support defendant's own position, which is substantially exculpatory in nature (that he had stolen the victims' car, but that he had not seen or harmed them). Further, this testimony would not have been allowed as an admission either, since it was not offered against a party, but rather, was offered to support defendant's own position.

Consequently, we find the defendant's statement admitting his possession of the stolen vehicle does not fall under the declaration against interest exception to the hearsay rule. Accordingly, we find that the trial court's decision with regard to this issue was correct.

Defendant next contends that the evidence presented during his trial was insufficient for the jury to find him guilty beyond a reasonable doubt of murdering Herd and Williams. His contention is based primarily upon the fact that the reliability of the gunshot residue analysis and the blood sample analysis are suspect, and are therefore not conclusive as to defendant's guilt. Consequently, defendant argues, his right to due process was violated.

This court has repeatedly held that the standard to be applied in reviewing the sufficiency of evidence in all cases, whether the evidence is direct or circumstantial (*People v. Pintos* (1989), 133 Ill. 2d 286, 290-93), is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Collins*, 106 Ill. 2d at 261.

As outlined previously, the evidence established that the victims left Williams' home to go shopping, in Herd's sister's car, at approximately 7:30 to 8 p.m. on February 15, 1986. The police received a telephone call notifying them that a man had been dumped from a car in an alley at approximately 9:20 p.m. The description of the car matched Herd's sister's car. The police went to that alley to investigate at about 9:35 p.m., and there they found Herd, who was fatally shot in the back of the head. At approximately 9:45 p.m., other police officers in the area spotted the suspect car, with defendant driving it. Defendant, after seeing the police officers, attempted to elude them, but, during the ensuing chase, he crashed into a building. When the officers approached defendant,

they saw him take a gun from the waistband of his pants and place it on the seat beside him. While the defendant was being arrested, the police saw blood and white fleshy matter on his face, his clothing, and on the automobile.

Williams' body was later found at approximately 10:35 p.m., in an alley two blocks away from where Herd's was discovered. She had been beaten to death with a tire jack, with blood and white fleshy matter splattered on a garage door near her.

Tests performed on defendant's hands for gunshot residue indicated that he had recently fired a gun. Ballistic comparisons between the bullet that killed Herd and the gun recovered from the defendant established that the gun was a .38 caliber and that the bullet was a "nonfactory" .38 caliber. Although the recovered bullet possessed the same general characteristics the bullets test fired from the gun, namely that they had seven lands and grooves with a twist to the right, it could not be conclusively determined that this particular gun fired the bullet that was recovered from Herd. The expended cartridges found in the gun were also nonfactory or "reload" cartridges.

Defendant's fingerprints were recovered from the car window, as well as from a plastic cup found inside the car. Tests performed on the blood that was splattered on defendant confirmed that it was consistent with Williams' bloodtype, but not with defendant's or Herd's. Also, the blood swabs taken from the tire jack, garage door, and car trunk lid indicated that that blood was also consistent with Williams' bloodtype.

As stated before, defendant primarily bases his position upon the unreliability of the evidence derived from the scientific analyses of the gunshot residue and the blood splatters. Specifically, defendant alleges that the atomic absorption spectrophotometer (AAS) technique,

which was utilized for the gunshot residue analysis in this case, is less than 100% accurate, and can sometimes produce false results. Therefore, according to defendant, it is possible that defendant had merely handled the gun, and had not actually fired it. Similarly, defendant contends that the scientific evidence gathered from the blood samples using electrophoretic procedures was not conclusive as to defendant's guilt, as it could not be determined that it was definitely Williams' blood splattered on the defendant.

Although these scientific tests do not conclusively prove that defendant is guilty, the results nevertheless are valuable evidence to be used in conjunction with the remainder of the evidence gathered in this case. The tests that were utilized are generally accepted tests used by forensic scientists in determining whether an individual has recently fired a gun (see *People v. Cole* (1988), 170 Ill. App. 3d 912, 931-32) and in detecting genetic markers in blood (*People v. Thomas* (1990), 137 Ill. 2d 500, 517-18; *People v. Eyler* (1989), 133 Ill. 2d 173, 213-16). Further, there is no indication that there are more thorough or accurate methods available to accomplish these specific tasks. As such, the expert testimony of the forensic scientists, using their community's accepted testing methods, was sufficient, in conjunction with the remainder of the evidence, to sustain the State's burden. Consequently, we believe that the cumulative effect of all of the evidence is sufficient, when viewed in the light most favorable to the State, to prove beyond a reasonable doubt that defendant murdered Herd and Williams.

Defendant next contends that he was denied effective assistance of counsel, in violation of the sixth amendment, due to certain omissions by his attorney. This court has previously held:

"[T]he constitutionally guaranteed assistance of counsel has not been provided if the defendant can prove that

counsel's representation fell below an objective standard of reasonableness and that counsel's shortcomings were so serious as to 'deprive the defendant of a fair trial, a trial whose result is reliable.' [Citation.] The court also indicated a defendant must establish 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Albanese* (1984), 104 Ill. 2d 504, 525, quoting *Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.

Accordingly, we must apply the *Strickland* test, adopted by this court in *Albanese*, to the facts of the case at hand. In applying this standard, the Supreme Court has determined:

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *** If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069-70.

In this case, defendant urges that his trial counsel erred in (1) failing to call witnesses at trial who were called at sentencing; (2) failing to locate certain "alleged" alibi witnesses; (3) failing to make a motion *in limine* to preclude the introduction of defendant's prior convictions; and (4) failing to object to the admission of certain evidence, testimony and improper remarks by the State. Defendant submits that he probably would not have been convicted had his attorney not committed these alleged errors. We disagree, for our review of the record demonstrates that even assuming, *arguendo*, that the alleged errors, taken together, constituted substandard representation, it has not been established that but for them, there was a reasonable probability that the result of this case would have been altered, in view of

the overwhelming evidence of defendant's guilt. Accordingly, there is no need to review the individual claims of inadequate representation to determine whether counsel acted within the range of reasonable professional assistance.

Defendant next argues that during the prosecutor's closing argument, he made remarks based on personal opinion; cast aspersions on defense counsel; vouched for the credibility of the State's witness; made an appeal to the jurors' passions; violated a court ruling; and made improper references to the victims. Defendant claims that the remarks made by the State during the closing argument went beyond the bounds of proper and fair comment, and shifted the jury's focus away from the evidence. He claims that because of the prejudicial nature of this prosecutorial misconduct, he was denied his constitutional right to a fair trial and due process of law.

First, according to the defendant, the prosecutor made remarks based on personal opinion and speculation which were improper and prejudicial. Specifically, the prosecutor commented that after the defendant was arrested, he identified his address as 105 Ashland. The prosecutor then mentioned that since he was a stranger to the neighborhood where the crimes occurred, that he had no reason to be there. We find that by virtue of defendant's failure to object at trial and to include this issue in his motion for a new trial, he has waived the issue for review. *Enoch,* 122 Ill. 2d 176.

Second, defendant claims that two of the prosecutor's remarks made in closing argument improperly cast aspersions on defense counsel, by essentially informing the jury that defendant and his counsel had no morals, no ethics and should not be believed. During rebuttal closing argument, the prosecutor made the following remarks:

"[Mr. Shultz]: And I have [sic] would suggest to you the toxicology reading, the alcohol in Bruce and Pam's blood is of total insignificance of [sic] this case. It's brought in by the defense for one reason only and that's what we call dirtying up the victims.

That [sic] that's why there is drugs in her blood and his blood and they're drunk. It has no relevance to this case.

&#42;&#42;&#42;

Mr. Smith says, well, Jerry Ward, yes, you stole the car, Jery [sic]. They caught you. The only reason he is telling you that is because his fingerprints are on that car and in that car. If his fingerprints weren't in that car, he would be telling you Scardino and the other cops are lying when they said they saw him in the car."

The first remark complained of was not objected to at trial, and, as such, review of it has been waived. (*Enoch*, 122 Ill. 2d 176.) With regard to the second remark, which was properly preserved for our review, we conclude that it was not improper. Defense counsel repeatedly questioned the veracity of the State's witnesses, so at this point of his closing, the prosecutor took the opportunity to emphasize one crucial fact that the defendant could not refute, the defendant's presence in the car.

Although our courts have condemned prosecutorial arguments which improperly disparage defense counsel, and while we agree with defendant that the prosecutor's use of language may have gone beyond responding to the matters raised by defense counsel, we do not consider this comment to have been unduly prejudicial such that it would have affected the verdict in this case. Consequently, we conclude that this second remark is harmless error.

Third, the prosecutor, according to the defendant, improperly bolstered the credibility of one of the State's witnesses, as well as of the State's Attorney's office itself. The State's witness, Curtis Rollins, testified that he

had heard two shots in the alley at about 9:20 p.m., and then at about 11 p.m., when he went to the store, he saw a body lying by a garage. He also testified that he did not call the police or tell the police what he had heard and seen when first contacted because he did not want to get involved.

The State, during its closing argument, in attempting to explain why Rollins did not come forward in the beginning, argued that psychological pressures are put on witnesses to crimes that force them to say, "I don't want to get involved," and that that is what Rollins did here. Consequently, the State implied that there was no incentive for Rollins to come forward during trial on behalf of the State, and that it may have been, in fact, dangerous for him to do so. According to the defendant, by arguing as such, the prosecution vouched for the credibility of Rollins. However, since these remarks were not objected to at trial, nor were they contained in defendant's motion for a new trial, we find that defendant has waived their review. *Enoch*, 122 Ill. 2d 176.

Also, according to the defendant, the prosecutor argued that it was not necessary for the State's Attorney's office to establish a motive for the murders, but that it nevertheless provided the jury with one, that being to steal the victim's automobile. The prosecution therefore implied that it had done more than it was required to do by law, which, according to defendant, improperly bolstered the credibility of the prosecutor's office. However, we conclude that the prosecutor's explanation to the jury that he did not have to prove motive is a correct statement of the law, and was therefore entirely proper. (*People v. Hobbs* (1966), 35 Ill. 2d 263, 269.) Further, statements indicating that a motive was proven, namely the desire to take the automobile, were based upon the evidence presented and were also proper comment. *People v. Huckstead* (1982), 91 Ill. 2d 536, 548.

Fourth, the defendant alleges that the State made an improper appeal to the fears of the jurors by commenting that they were lucky not to have been the ones in their cars when defendant was trying to steal it. However, once again, this claim of error has been waived due to defendant's failure to object at trial and to include the issue for review in his motion for a new trial. *Enoch*, 122 Ill. 2d 176.

Fifth, defendant contends that he was denied a fair trial because the prosecutor violated one of the court's rulings during his closing argument. During the exhibits conference, the court ruled that a photograph of a section of Williams' head (People's Exhibit No. 69) would not be shown to the jury unless the *defendant* raised the issue as to whether Williams was shot. According to the defendant, the prosecutor violated this order by first arguing that Williams had been shot, and then showing the photograph to the jury, without the defendant having first raised the issue.

However, as pointed out by the State, it is clear that the trial court had already considered, during closing arguments, whether the prosecutor violated its order, and that it specifically found that he had not. Although it is questionable as to whether the defendant sufficiently addressed whether Williams had been shot in his closing argument, so as to satisfy the court's initial ruling that he first raise the issue, we believe that the trial court was in a better position to know the spirit and meaning of its own ruling, and to determine whether the prosecutor violated it. Therefore, we decline to disturb the court's finding.

Sixth, the prosecutor's numerous comments that the victims were speaking to the jury through the other witnesses who testified, according to the defendant, were made to arouse the passions and prejudices of the jury.

The prosecution made the following remarks during its closing argument to the jury:

"You know what happened here, ladies and gentlemen. Pamela Williams and Bruce Herd didn't testify here, obviously. But they spoke to you through the various exhibits and through the various other witnesses that testified here.

When the family testified, Pamela and Bruce told you that they were alive and well and they had that car and that they were to [sic] together.

When DeMarco and Patterson testified about the finterprints [sic], Pamela and Bruce spoke to you, too. And they told you that this man got in that car. And when Sergeant Gainer testified here, Bruce Herd spoke to you and he told you that that was the gun that this man used to kill me.

When Kathy Gehagan [sic] testified here, Bruce Herd spoke to you and said he is the one that shot me.

And when Pamela Fish testified here, Pamela Williams told you through her that that was her blood that was on him; that was on the car that he was in; that was on his clothes.

And when Doctor Donaghue testified, Pamela and Bruce spoke to you, too. And they told you how it was that they died. And when Officer Scardino and Peck and Summerville testified to you, Pamela Williams screamed to you, ladies and gentlemen, that man murdered me. He took that jack and beat my skull in. And he murdered Bruce Herd."

Once again, these comments were not objected to at trial, nor were they included in defendant's motion for a new trial and, as such, review of these comments on appeal has been waived. (*Enoch*, 122 Ill. 2d 176.) Further, neither these comments, nor any other complained-of comments made during the State's closing argument which are unreviewable due to the waiver doctrine, amount to plain error, as the evidence in this case is not closely balanced and these alleged errors are not of such

magnitude that defendant was denied a fair trial. *Carlson*, 79 Ill. 2d 564.

Lastly, defendant claims that if none of the prosecutor's remarks is individually sufficient to reverse the trial court's judgment, then the remarks' impact should be considered cumulatively, since each compounds the errors and aggravates the harm of the others. However, as the court enunciated in *People v. Henderson* (1990), 142 Ill. 2d 258, 323, "comments constitute reversible error only when they engender substantial prejudice against a defendant [citation], such that it is impossible to say whether or not a verdict of guilt resulted from those comments." Here the evidence, which was substantially one-sided, and not the closing argument, was the cause of the verdict. Accordingly, we find that none of the above comments, taken individually or cumulatively, was sufficient to constitute reversible error.

Defendant next alleges that his conviction for armed robbery should be vacated since the evidence at trial was insufficient to prove that charge. Defendant relies on *People v. Smith* (1980), 78 Ill. 2d 298, 302-03, for the proposition that the State must prove that the robber used violence or fear of violence as a means to take property in the control of the victim. According to the defendant, the State failed to prove beyond a reasonable doubt that the violence exerted in this case was used as a means to take the automobile, and thus, his armed robbery conviction should be reversed. The defendant points out that although the State implied at trial that the reason for the shooting was to take the automobile, it presented no evidence in support of its contention.

Force or the threat of force is an element of the offense of armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—2), and this court has held that the necessary force or threat of force must be used as a means of taking the property from the victim (*People v. Tiller* (1982), 94 Ill.

2d 303, 316). In *Tiller*, the primary case relied upon by the defendant, Tiller was convicted of murder, on an accountability theory, and of armed robbery for his taking of the victim's vehicle. The defendant had left the scene before the murder was committed by a codefendant and only later returned to take the vehicle, a mail jeep, which was parked nearby. The court ruled that the force used in the commission of the murder would not sustain the defendant's conviction for armed robbery because "there [was] no evidence to show that the force exerted against [the victim] was for the purpose of depriving her of the mail truck or the mail in it." *Tiller*, 94 Ill. 2d at 316.

We do not believe that the instant case is governed by *Tiller*, for here the offenses were essentially a single series of continuous acts committed by the defendant, as evidenced by the close proximity in time between the shooting and the capture of the defendant. To hold otherwise would be to concede that there could never be a robbery conviction without a witness testifying to the fact that the force exerted against the victim was for the purpose of depriving him of the property. That would be erroneous, since we know that the elements of the offense may be proved by circumstantial evidence. *People v. Taylor* (1984), 101 Ill. 2d 508, 514-15; *People v. Susanec* (1947), 398 Ill. 507, 512-13.

We agree with the State that this case is more factually similar to *People v. Williams* (1987), 118 Ill. 2d 407. In *Williams*, the defendant, who was charged with armed robbery, similarly contended that the State failed to prove that force or the threat of force was used to effect the taking of a necklace from a rape victim. In support thereof, the defendant pointed out that there was no evidence of a demand for money or property from the victim, and that the victim was unable to say at what point during the ordeal that the necklace was taken. In

that case, the victim testified that she was wearing the necklace at the time she was first confronted by the defendant. Further, the court had already found that the jury could have inferred that the necklace was taken from the victim or her presence during or immediately after the attack. During that assault, after the defendant bound, gagged, and blindfolded the victim, he struck her, raped her, and threatened to kill her. The court held that whether the defendant took the necklace from the victim's person or whether he picked it up off the floor after committing the assault, there was the necessary concurrence between the defendant's use or threat of force and his taking of the necklace to give rise to the offense of armed robbery. *Williams*, 118 Ill. 2d at 415-16.

In support of its claim in this case, the State introduced the testimony of Clara Herd Johnson, who testified that she owned a 1977 Buick, and that on the evening of February 15, 1986, she lent that vehicle to Bruce Herd. Gerald Williams then testified that Herd and Williams left his home at about 8:20 to purchase a six-pack. Further evidence indicated that two shots were fired that evening at about 9:20 p.m. in the alley at 3824 Grenshaw. Then, at about 9:35 p.m., the police, in response to a call about a man being dumped from a car, found Herd's body in an alley at 914 South Independence. Minutes later, in the same vicinity, defendant was spotted by police officers driving that Buick. The defendant, upon seeing the officers, attempted to speed away, but he was eventually apprehended, while in possession of a gun. Defendant was then placed under arrest at approximately 9:50 p.m. As a result of this circumstantial evidence, the jury could have reasonably inferred that the automobile was taken from Herd or from his presence during or immediately after defendant's attack. Consequently, we believe that in this case there was the necessary concurrence between the defendant's use or

threat of force and his taking of the automobile to give rise to the offense of armed robbery under the statute. See 2 W. LaFave & A. Scott, Substantive Criminal Law §8.11(e), at 452-54 (1986).

In reviewing the sufficiency of the evidence to sustain a conviction, the relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. (*Collins*, 106 Ill. 2d at 261.) We conclude that the jury could have found beyond a reasonable doubt from the evidence presented here that the defendant took the automobile from the person or presence of the victim by force or the imminent threat of force.

## SENTENCING ISSUES

The first sentencing issue raised by the defendant is whether the State proved that the offense of murder was committed in the course of the offense of armed robbery. Defendant claims that the State failed to do so, and that therefore the death sentence must be vacated.

The law is clear that a defendant may be sentenced to death only if he has attained the age of 18 or more, has been found guilty of murder, and the State can prove that one or more aggravating factors are present. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b).) The court, in sentencing the defendant to death, found that he was eligible since the murders were committed in the course of another felony (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)), namely armed robbery.

In arguing that the State failed to prove that the murder was committed in the course of an armed robbery, the defendant submits that no evidence was presented regarding the circumstances of the shootings, and that the State only implied that defendant shot Herd to steal the car. The defendant relies principally upon *Tay-*

*lor*, 101 Ill. 2d 508, wherein the court vacated the defendant's death sentence, finding the evidence insufficient to prove that a murder had been committed in the course of an armed robbery, to support his theory for reversal. However, defendant fails to note that in *Taylor*, the defendant's conviction for the armed robbery charge was reversed. As that is not the case here, we cannot rely on *Taylor* to support the defendant's position.

We have previously held that it is not necessary to prove, beyond a reasonable doubt, that the defendant formed the criminal intent to commit the aggravating felony before committing the murder, but that it is sufficient that the State prove the elements of the murder and of the accompanying felony, and that they both were part of the same criminal episode. (*People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 373; *Thomas*, 137 Ill. 2d at 533-35.) Here, the State proved beyond a reasonable doubt that the defendant committed both murder and armed robbery, and that they occurred essentially simultaneously. The trial testimony and the evidence, which demonstrates the necessary concurrence between the defendant's shooting of Herd and his taking of the automobile, sufficiently support the conclusion that the murder occurred "in the course of" an armed robbery. Consequently, the death sentence will not be vacated because the aggravating factor was supported by the evidence.

Defendant next complains that testimony regarding his prison record, as well as the record itself, which documents 35 incidents of defendant violating prison procedures, were improperly admitted and considered as aggravation evidence during his sentencing hearing. Defendant submits that this evidence is hearsay, by virtue of the fact that the witness who was used to introduce this evidence failed to testify from personal knowledge, but instead relied on reports prepared by unnamed individuals who did not testify at the hearing.

Cameron Forbes, a records office supervisor for the Illinois Department of Corrections, testified concerning defendant's prison record. Most of his testimony involved the disciplinary sheets kept on the defendant, which detailed the various violations, as well as the imposed sanctions. He testified about 29 violations which occurred from 1982 to 1985 (although there appeared to be actually 35 upon our review of the record), but admitted that he had no personal knowledge of anything contained in the reports. He further testified that when hearings are conducted on prison violations, the standard of proof is by a preponderance of the evidence, and that if witnesses are called, they are not sworn. He finally stated that if a violation was found insufficient, it was not recorded in the report. At the conclusion of its aggravation evidence, the State moved for the admission of these records. Over defendant's objection, the court allowed his prison records into evidence under the business records exception to the hearsay rule.

The defendant primarily relies upon *People v. Smith* (1990), 141 Ill. 2d 40, to support his position that prison incident reports are not admissible at trial under the business records exception (Ill. Rev. Stat. 1983, ch. 38, par. 115—5(a)), when offered to prove the particulars of disciplinary infractions or of confrontations between prison employees or law enforcement personnel and prison inmates. However, we believe that the disposition of this issue is not controlled by *Smith*, since evidence of defendant's prison record was admitted during the sentencing hearing, and not during the guilt phase of the trial, as occurred in *Smith*. Actually, this issue should not be analyzed under the business records exception, as was both suggested by the defendant and relied upon by the trial court. Instead, the admissibility of the prison records should be reviewed in light of section 9—1(e) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38,

par. 9—1(e)), which specifically governs the admissibility of evidence during a death sentencing hearing.

The determination of whether the death sentence is proper in a particular case requires consideration of the character and record of the individual offender. (*People v. Steidl* (1991), 142 Ill. 2d 204, 246, quoting *People v. Perez* (1985), 108 Ill. 2d 70, 93.) As this court explained in *People v. Hall* (1986), 114 Ill. 2d 376:

> "Section 9—1(e) of our death penalty statute allows the introduction of evidence during the sentencing hearing that would not ordinarily be admissible during the guilt phase of a trial. [Citations.] The factors controlling the admissibility of evidence at a capital sentencing hearing are relevance and reliability, and the determination of admissibility rests in the discretion of the trial court. [Citations.] Hearsay testimony will not *per se* be deemed to be inadmissible at a sentencing hearing as denying a defendant's right to confront witnesses. [Citations.]" *Hall*, 114 Ill. 2d at 416-17.

We do not believe that the trial court abused its discretion here in allowing the defendant's prison record to be introduced during the sentencing hearing. Of the numerous reported incidents, there appears to be only one of major significance, that being a sexual assault on a fellow inmate, Tyrone Ridgeway. Defendant lost almost one year of "good time" as a result of that attack, after which he was also found in possession of contraband. The reliability of this incident was established through the testimony of Ridgeway, who testified at the sentencing hearing that in May 1982, when he was 17 years old, he was incarcerated at the Pontiac Correctional Center with defendant; that defendant forced him, at "shank" point, to have sex with both defendant and defendant's friend; and that two other friends of defendant threatened to burn his cell with him in it if he did not sign an affidavit withdrawing his charges against defendant for

the attack. Moreover, the reliability of this evidence is demonstrated by the fact that defendant did not seriously contest the occurrence of this incident, or the sanctions which were imposed at the resulting disciplinary proceeding. See *Hall*, 114 Ill. 2d at 417.

The defendant further argues that the introduction of the testimony of Ridgeway regarding that one incident does not render the evidence as to the remaining 34 incidents reliable, since defense counsel could not cross-examine the records or the record-keeper regarding these other incidents. Although defendant makes a valid point here, it is important to note that the remaining incidents were insignificant when compared to the one in which testimony was elicited. It would have been a gross misuse of the court's resources to present independent testimony of the remaining 34 separate incidents which allegedly took place, especially in light of their relatively minor nature (*e.g.*, breaking prison rules, not following guard's orders, unauthorized movement, etc.). Although defendant points out that prison records have been held to be unreliable for purposes of the guilt phase of the trial on the basis that these records are generally documented with an eye towards some form of subsequent discipline (see *Smith*, 141 Ill. 2d at 73), we do not agree that that rationale should preclude the introduction of defendant's prison record in this instance.

We believe that there is no reason to question the reliability of defendant's prison record with regard to the remaining incidents. The testimony of Cameron Forbes revealed that these records were kept in the ordinary course of business, during and after defendant's confinement in that penitentiary. Not allowing this type of evidence during the sentencing hearing would produce unnecessary hardship for the prosecution where, as here, the incidents occurred several years before the present charges. Locating the various people with personal

knowledge of these minor violations is often not feasible, and sometimes impossible. (See *United States v. Lewis* (7th Cir. 1990), 910 F.2d 1367.) Therefore, in the absence of any persuasive argument by the defendant as to why his particular prison record is unreliable, we conclude that defendant's argument here is without merit.

The defendant's next contention of error is that his prison record was improperly considered by the court, in that it based his sentence upon the belief that defendant would harm or kill a fellow inmate or prison employee if not put to death. According to the defendant, future dangerousness is not a proper aggravating factor upon which to base a sentence of death. In support of his theory, the defendant relies on *People v. Holman* (1984), 103 Ill. 2d 133. Accordingly, defendant submits that he should be entitled to a new sentencing hearing.

The State claims, however, that it was not the "future dangerousness" of the defendant, but rather defendant's assimilation and conforming potential that the court considered, when it admitted the defendant's prison record during the sentencing hearing. Also, the State contends that the court based its decision on various factors, only one of which was defendant's prison record.

Our review of the trial record reveals that the judge based his decision to sentence the defendant to death on numerous factors. Among those considered were the facts of the crime itself, its nature, and defendant's actions; his prior criminal history, which includes four criminal convictions; his history of having weapons while incarcerated, including what he did while in possession of those weapons; his inability to conform his conduct to any social standard; the finding that he was incorrigible and not subject to any type of rehabilitation; and the violence and cruelty which he perpetrated on the community by virtue of these assaults.

We conclude that defendant's reliance on *Holman* is misplaced. In that case, the court vacated the death penalty because of remarks made by the prosecutor during his closing argument. In *Holman*, the prosecutor repeatedly focused the jury's attention on extraneous fears and diverted its attention from considering the aggravating and mitigating factors presented in the case, the character and record of the defendant, and the nature and circumstances of his offense. In fact, his closing argument culminated in the bald assertion that by not sentencing the defendant to death the jury would be, " 'virtually guaranteeing down the road future innocent victims will be slaughtered.' " (*Holman*, 103 Ill. 2d at 164.) However, in the case at hand, at no point does the judge imply that death was imposed to prevent defendant from committing future criminal offenses against innocent victims. In contrast to *Holman*, defendant's sentence here was based on reason rather than emotion.

We believe that the judge properly focused on the character and record of the offender, as well as the circumstances surrounding the offenses, as required by *Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991. The defendant's prison record, which was only one of many factors considered by the court, is certainly allowable as evidence of the defendant's character and rehabilitative potential. Accordingly, we dismiss this contention of error by the defendant.

Defendant next alleges that the testimony of Renee Jackson concerning an uncharged rape claim should not have been allowed during the sentencing hearing because it was unreliable. Accordingly, defendant argues that he should be entitled to a new sentencing hearing.

Renee Jackson testified that on July 14, 1980, at approximately 11 p.m., while she was in the area of 3951 West Arthington, she encountered defendant, whom she

knew to be a friend of her brother; that while she was talking to defendant, he pushed her into a van and raped her; that she went to the police and hospital one or two days later; but that she never signed a complaint against defendant.

Officer Donald Wolverton testified that he had spoken to Jackson on July 16, 1980, as part of his investigation of the alleged rape. She gave him a physical description, after which they traveled to a location at which they believed the alleged rapist to be. Upon arrival, she pointed out the defendant as the culprit.

A requirement for the admissibility of evidence at the aggravation/mitigation phase of the sentencing hearing is relevancy and reliability. (*Perez*, 108 Ill. 2d at 86; *People v. La Pointe* (1981), 88 Ill. 2d 482.) Defendant argues that the testimony regarding the alleged rape falls below an acceptable level of reliability, and was therefore inadmissible. In support of his position, the defendant relies on *People v. Harris* (1989), 129 Ill. 2d 123, wherein this court vacated a death sentence because the trial court considered unreliable testimony pertaining to defendant's participation in a murder.

Facts highlighted by defendant here are that rape charges were never brought against defendant after he was arrested; that Jackson had told the assistant State's Attorney that she was high on drugs at the time of the alleged rape, and that she had been drinking prior to the alleged incident; that she had no bruises or marks, and had made no outcry immediately after the alleged attack; and that there was no independent corroboration of defendant's involvement.

The State, on the other hand, contends that the reliability of this incident was established through the direct and cross-examination testimonies of Jackson and Detective Wolverton, and the stipulation to Assistant State's Attorney Tsunkdo's testimony. Alternatively, the State

points out that the record fails to affirmatively show that the court even relied on this incident as an aggravating factor in sentencing defendant to death, and, as such, defendant has failed to rebut the presumption that the court considered only relevant and reliable evidence. (See *Harris*, 129 Ill. 2d at 163-64.) We agree, and find for the State here.

Contrary to the defendant's allegation, evidence as to his previous misconduct may be admitted even though it did not result in a prosecution or a conviction. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 365.) As such, the fact that the State's Attorney's office chose not to prosecute this charge does not preclude the introduction of this evidence during defendant's sentencing hearing. Instead, its admission is left to the discretion of the trial court (*People v. Free* (1983), 94 Ill. 2d 378, 423), by applying the two-pronged test laid out in *La Pointe* and *Perez*.

The reliability question here was satisfied as a result of the cross-examination of Jackson, the testimony of Wolverton, and the stipulation to Tsunkdo's testimony. Our conclusion is further solidified in light of the fact that the court was thoroughly informed that the State did not charge the defendant with this rape, as well as its reasons for failing to do so. Consequently, we find that the trial court did not abuse its discretion in allowing the introduction of this evidence since the court heard all of the available evidence surrounding the incident to determine what weight, *if any*, should be afforded to Johnson's testimony, before sentencing defendant.

Most importantly, even though the trial court heard all of the evidence regarding the alleged rape, there is no indication in the record that it considered this evidence to be an aggravating factor in imposing the death sentence. Conversely, in *Harris*, this court held that the trial court erred by placing heavy emphasis, during its

summation of the evidence, upon the alleged murder committed by defendant. Before sentencing, the *Harris* court stated that "the evidence is positive and credible that the defendant did kill [the victim] in 1969," even though there was very substantial evidence that the defendant did not participate in that murder. In the case at hand, the record reveals that while the trial court specifically considered defendant's prior criminal convictions, as well as defendant's sexual assault on Ridgeway while incarcerated, there is no indication that the court gave any weight to defendant's alleged assault of Jackson. As such, defendant has failed to rebut the presumption that the court considered only proper evidence; consequently, a new sentencing hearing is not warranted based on this allegation.

Defendant's next claim of error is that the trial court failed to properly consider mitigating evidence concerning defendant's tragic family life. As a result, he argues that this court should vacate the death sentence and remand this matter for resentencing.

Defendant, through the testimony of his twin brother, Abdul Salaam, and his uncle, Richard Ward, offered evidence of his tragic childhood and young adulthood, in which he lost four members of his immediate family within a 10-year time period. Among the evidence introduced was that at the age of 15, he had witnessed his mother, to whom he was very close, being shot and killed by his father; that a few years later, defendant's older brother was shot and killed; and that both of his sisters died of illnesses within one year of each other.

In support of his argument, defendant relies on *Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869, wherein the Court vacated the defendant's death sentence because the trial judge did not consider and weigh his tragic family life as a mitigating factor. The *Eddings* Court held that the eighth and

fourteenth amendments mandate that the sentencer consider any relevant mitigating factor introduced into evidence prior to imposing the death sentence.

A review of the record in this case reveals that the trial court did, in fact, consider this evidence but found it insufficient to preclude the imposition of the death penalty, as demonstrated by the following excerpt from the court's findings:

"And lastly we come to the argument of Kevin Smith, his lawyer, which was corroborated by testimony of the victim's [sic] twin brother and his uncle, that Mr. Ward's actions should be explained away by indicating he has a background which evokes some sympathy for what occurred to him when he was in his early life and that is that because his mother was killed by his father when he was 14 years old and it was done in front of him and his twin brother, that therefore that is some explanation for his course of conduct over the next 18 years.

And secondly, that when his older brother was killed, again by being shot by someone, that those acts cause in him a bitterness, as his uncle testified, a bitterness which makes him believe that no one cares about him and no one will comfort him.

Well, I think it's obvious from his conduct that that is what he thinks, and whether he's striking out silently because of what he believes is injustice in society for what happened to his brother and his mother or whether that has aberrated [sic] his conduct in some way, that, we as ordinary humans, cannot tell because we can't get in someone's head to find out what motivates them. It doesn't matter. The result is the same and the result is violence and cruelty and assaults and death.

And that is what Mr. Ward has perpetrated on this community and for that reason, Mr. Ward, I believe that the appropriate sentence is that you be sentenced to death and that is the order of this court."

Defendant alleges that evidence of a defendant's troubled childhood must be found to have mitigating weight;

however, this exact contention has been previously raised and rejected by this court in *Henderson*, 142 Ill. 2d 258, where it distinguished *Eddings*, as follows:

"Defendant endeavors to persuade us that, because the [*Eddings*] Court has said a sentencer cannot refuse to consider relevant mitigating evidence presented by a defendant, it has held that a sentencer must give it some mitigating weight. We disagree with the conclusion. The Court has held only that when the sentencer is a judge, the sentencer cannot refuse to hear evidence introduced as mitigating, and cannot refuse to consider whether that evidence is in fact mitigating on the basis that the sentencing judge believes the evidence is barred by law from being considered as mitigating." *Henderson*, 142 Ill. 2d at 338.

In the case at hand, the trial judge believed defendant deserved to be sentenced to death. The quoted comments do not show that the trial judge believed he was somehow precluded from viewing the evidence of defendant's background as mitigating; rather the trial judge admitted this evidence, considered what it revealed about defendant, and concluded that it simply had no mitigating value but may have been, in fact, actually aggravating. (See *Henderson*, 142 Ill. 2d at 339 (where the court held "that evidence of an upbringing which has caused a defendant to become violent and aggressive can be considered in aggravation, for one duty a sentencer has is to predict a defendant's future behavior based on his past behavior").) Consequently, the trial court did not err in its evaluation of this evidence.

The defendant next challenges his sentence by indicating that the trial court abused its discretion by failing to find, as a mitigating factor, that the defendant had no significant history of prior criminal activity (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)(1)). Instead, the court found defendant's prior felony convictions to be an aggravating factor.

We find that this argument is meritless. The record showed that the defendant had six prior felony convictions (although the judge only acknowledged four during his summation): three for burglary, two for unlawful use of a weapon and one for theft. Regardless of whether it was four or six prior felony convictions, we cannot say that the trial court erred in finding a "significant history of prior criminal activity" and, finding no abuse of discretion here, we decline to reverse the imposition of the death sentence. See *People v. Wright* (1985), 111 Ill. 2d 128, 165-66; *People v. Madej* (1985), 106 Ill. 2d 201, 221.

Next, defendant claims that his constitutional rights were violated when the court found that both victims had been immobilized, and then intentionally killed. Before sentencing the defendant to death, the judge made various findings which, in his view, made the death penalty appropriate. Among those findings were that Bruce Herd was somewhat immobilized during the shooting, and that his murder was unquestionably premeditated. He based these conclusions upon the location of the wound, the lack of any evidence of a struggle, and the manner in which the body was disposed. As to the circumstances surrounding Pamela Williams' death, the judge concluded that she was lying on the ground, immobilized, before being struck repeatedly by a jack handle. He based this conclusion upon the location of her injuries, the pattern of the bloodstains in the surrounding area, and the testimony of a forensic pathologist.

The defendant first claims that the judge's findings were not supported by the evidence. Additionally, the defendant claims that the trial judge improperly focused on the fact that defendant *intended* to kill when he shot Herd, a factor which is implicit in the offense of murder and which, under this court's reasoning in *People v. Conover* (1981), 84 Ill. 2d 400, cannot be considered in aggravation. We disagree on both accounts.

First of all, as this court has previously held in *Wright*, 111 Ill. 2d at 162, "[t]he Illinois Constitution and decisions of the United States Supreme Court mandate 'consideration of the character and record of the individual offender and *the circumstances of the particular offense* as a constitutionally indispensable part of the process of inflicting the penalty of death.' (*Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991; see Ill. Const. 1970, art. I, sec. 11; *People v. Szabo* (1983), 94 Ill. 2d 327, 352.)" (Emphasis added.) The defendant's complaint directly attacks the court's ability to analyze the circumstances of these murders. It is true, as the defendant points out, that there was no direct evidence presented at trial as to the actual circumstances of either killing; however, the judge can, and did, make reasonable inferences as to what transpired, based upon the circumstantial evidence introduced during trial. Because another trier of fact could have concluded that the murders occurred differently does not render the judge's determination here suspect.

As stated in *People v. Christiansen* (1987), 116 Ill. 2d 96, 122, "[t]he rule that this court will 'not lightly overturn the findings of the trial court, particularly when they are amply supported by the record,' applies to findings made during the aggravation and mitigation phase of the death penalty hearing." (Quoting *People v. Brownell* (1980), 79 Ill. 2d 508, 539-40.) We believe that the record amply supports those findings of the court, and therefore, we will not disturb them.

With regard to the defendant's second claim that the trial judge improperly focused on the fact that the defendant *intended* to kill Herd, we conclude that the court also did not act improperly. Our reading of the record leads us to believe that the defendant is reading this portion of the court's summation out of context. After

describing the circumstances of Bruce Herd's murder in detail, the court stated, "And I find that that is a significant type of murder, one which is calculated to kill, one which is done with no intent but to murder. Under the old law that would have been as premeditated as you can get." The court did not consider defendant's *intention* to commit the murder, in and of itself, as an aggravating factor. Rather, after reviewing the circumstances, it considered the murder to have been committed in a cold, calculated and premeditated manner, very similar to an aggravating factor currently codified in section 9—1(b)(11) of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(11)). Although this section was not in effect at the time of the murders, it is clear that the judge was not precluded from taking into consideration aggravating factors other than those set forth in section 9—1(b) (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)). The fact that the legislature has subsequently adopted this factor as a part of section 9—1(b) provides us with some additional confirmation of our view that the callousness of the murder is a very important factor to be considered when deciding whether to sentence someone to death.

Defendant also raises for our review the propriety of his sentence. He argues that the death penalty is excessive and inappropriate in his case, and that it should be reduced to natural life by this court.

The Constitution requires that consideration be given to the character and record of the offender and the circumstances of the offense before a determination is made that death is the appropriate sentence. (*Woodson*, 428 U.S. at 304, 49 L. Ed. 2d at 961, 96 S. Ct. at 2991; *People v. Steidl* (1991), 142 Ill. 2d 204, 246.) "When reviewing a sentence of death, this court will make a separate evaluation of the record but will not overturn a trial court's findings when amply supported by the evidence."

*People v. Odle* (1988), 128 Ill. 2d 111, 136, citing *Brownell*, 79 Ill. 2d at 539-40.

Here, the judge sentenced defendant to death for the double murder of Bruce Herd and Pamela Williams. In so doing, the court noted a number of factors it took into consideration, namely, the violent manner in which the victims were murdered; the fact that they appear to have been executed in a cold, calculated and premeditated manner; defendant's extensive criminal history; defendant's propensity to commit violent acts; his disciplinary problems in the penitentiary, especially his multiple possession of weapons violations; and his inability to assimilate himself into any society, or to be rehabilitated. In mitigation, the judge considered the defendant's arguments that because of his tragic family life, he should be partially excused, and therefore spared the death penalty (although, as mentioned previously, this is arguably an aggravating factor); and that someone other than defendant may also have participated in the murders (which, because of the type and lack of evidence supporting this theory, we cannot see having had much mitigating value).

Only after considering all of these factors in aggravation and mitigation, and having found no mitigating factors sufficient to preclude the imposition of the death penalty, the court directed the sentence of death for the defendant. Accordingly, after our independent review of the record, we agree with the trial court that the death sentence is not excessive or inappropriate in defendant's case, given the nature of the crime and the character of this defendant.

Defendant's final sentencing contention is that his first amendment rights were violated when the State introduced testimony that he was a gang member. Relying on a recent Supreme Court case, *Dawson v. Delaware* (1992), 503 U.S. ___, 117 L. Ed. 2d 309, 112 S. Ct.

1093, defendant alleges that his death sentence should be vacated since this evidence was not relevant to any issue at sentencing.

In *Dawson*, the Court held that it is a violation of a person's first amendment right to freely associate when the prosecutor introduces testimony during a death penalty hearing regarding one's gang affiliation, when it is irrelevant to proving any aggravating circumstances.

In the instant case, the defendant argues that the following testimony of Tyrone Ridgeway, the victim of defendant's sexual assault, was violative of his constitutional rights:

"Q. [Mr. Brogan, Assistant State's Attorney]: And would you tell us during that conversation what Mr., [*sic*] what Twin [defendant] said to you and what you said to him as best you can recall.

\* \* \*

THE WITNESS: He asked if I needed any cigarettes or zu zu and wam wams, meaning candy.

THE COURT: Zu zus?

THE WITNESS: I think I replied I didn't need anything, and he told me that literature concerning the organization was at his house and that we would go over there later.

MR. BROGAN:

Q. Okay, the organization, what organization was that?

A. The Vice Lords.

Q. And the Vice Lords is a street gang, is that correct?

A. That's my understanding, yes.

Q. Did Twin tell you anything about any type of [*sic*], if you had any problems or anything?

A. Yes, he said, after stating that he wanted to go over some literature, he said if I had any problems, to let him know if he could take care of it he would take it to a higher ranking person.

Q. And when he said higher ranking person, did he use a specific term for that?

A. Not specific as, I mean I am saying a higher ranking person as in the line of command, okay[.]

Q. In the line of command of this Vice Lords?

A. Yes.

\* \* \*

MR. BROGAN:

Q. Mr. Ridgeway, Twin was a Vice Lord, is that right?

MR. SMITH: Objection.

THE COURT: Overruled.

THE WITNESS: Yes.

MR. BROGAN:

Q. Do you know what rank he had in Pontiac at that time?

MR. SMITH: Objection.

THE COURT: Well, if Mr. Ridgeway knows, he can testify, if he doesn't know, he can tell us.

THE WITNESS: Well, it's hearsay.

THE COURT: It's all right.

THE WITNESS: Yes, I know, otherwise he told to me that he was lieutenant of the gallery, that is."

Furthermore, defendant points to the following statement made by the judge, to prove his reliance on this testimony in sentencing defendant to death:

"Mr. Ward, the last time he was in the penitentiary on a four year sentence, spent more than three and a half years in prison because all of his good time was taken away and each time they took away his good time and he completed his segregation period and [was] let out, he immediately imbarked [*sic*] upon the same course of conduct again, which was insolence to the guards, possession of weapons, intimidation of other inmates, *gang activities*, and threatened violent acts against other people in the penitentiary." (Emphasis added.)

The State counters defendant's argument here by stating that his membership in the Vice Lords was rele-

vant, in that it illustrated how the defendant was able to intimidate his fellow inmates.

We find the State's argument unpersuasive, as the evidence that was introduced failed to sufficiently tie in the relationship between defendant's gang affiliation with any other legitimate aggravating factor. Although this evidence was introduced contemporaneously with testimony relating defendant's attack on Ridgeway, the State failed to show how they were necessarily related. However, "[n]otwithstanding the occurrence of constitutional error at trial, a criminal conviction may be affirmed if the reviewing court is able to conclude, upon examination of the entire record, that the error was harmless beyond a reasonable doubt." (*People v. Howard* (1991), 147 Ill. 2d 103, 148, citing *United States v. Hasting* (1983), 461 U.S. 499, 510-11, 76 L. Ed. 2d 96, 107, 103 S. Ct. 1974, 1981.) We conclude that the judge's reliance on the gang testimony here constituted harmless error.

In support for our conclusion, we find that there were numerous other aggravating factors relied upon by the judge in sentencing defendant (*e.g.*, the violent nature of the murders, the fact that they appeared to have been premeditated, defendant's extensive criminal background, his propensity to commit violent acts, his disciplinary problems in the penitentiary, and his inability to assimilate himself into society, or to be rehabilitated); that there were virtually no mitigating factors present; that the weight placed on the gang testimony appeared to be extremely minimal, as the judge mentioned the gang affiliation only once, that even being very brief, during his sentencing summation. Consequently, as we conclude that this error was harmless beyond a reasonable doubt, we will not vacate the defendant's sentence.

## CONSTITUTIONALITY OF THE DEATH PENALTY

Defendant next makes a series of challenges to the

death penalty itself. We hold here, however, as we have in numerous other cases, that these challenges are without merit. Defendant first contends that the Illinois death penalty statute places the burden of persuasion on the defendant, thereby violating the eighth and fourteenth amendments of the United States Constitution (U.S. Const., amends. VIII, XIV).

The Illinois death penalty statute states, in pertinent part, as follows:

"If the Court determines that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the Court shall sentence the defendant to death." Ill. Rev. Stat. 1983, ch. 38, par. 9—1(h).

We have repeatedly stated that no unconstitutional burden-shifting is encompassed within this provision. (*Thomas*, 137 Ill. 2d at 537; *People v. Jones* (1988), 123 Ill. 2d 387, 426-27; *People v. Morgan* (1986), 112 Ill. 2d 111, 147-48; *People v. King* (1986), 109 Ill. 2d 514, 546-47; *People v. Caballero* (1984), 102 Ill. 2d 23, 49.) Therefore, we decline to reconsider the constitutionality of this provision in light of the fact that the defendant has not brought to our attention any recent developments which render these prior decisions invalid.

Defendant further contends that various features of the Illinois death penalty statute, which this court has found individually constitutional, are unconstitutional in their totality because together they result in arbitrary and capricious imposition of the death penalty. Defendant contrasts Illinois' statute with provisions of other States' statutes which allegedly impose more controls over the decision to impose death. But the "fact that other States have enacted different forms of death penalty statutes which also satisfy constitutional requirements casts no doubt on [one State's] choice." (*Blystone v. Pennsylvania* (1990), 494 U.S. 299, 309, 108 L. Ed. 2d 255, 266, 110 S. Ct. 1078, 1084.) This court has care-

fully reviewed each of the components of defendant's challenge, as well as their combined effect, and has concluded that the statute minimizes the risk of arbitrary and capricious death sentences sufficiently to satisfy the Constitution. "If all of the individual aspects are constitutional, we stand by the conclusion that the whole is also constitutional." (*People v. Phillips* (1989), 127 Ill. 2d 499, 542-43; see also *People v. Bean* (1990), 137 Ill. 2d 65, 141; *Thomas*, 137 Ill. 2d at 549-50.) Therefore, we find that defendant's unconstitutionality arguments are without merit since he presents no ground for overruling these decisions.

For all the reasons stated, we affirm the defendant's convictions and sentence for murder, armed robbery, and possession of a stolen vehicle. The clerk of this court is directed to enter an order setting Tuesday, March 9, 1993, as the date on which the death sentence, entered in the circuit court of Cook County, is to be carried out. Defendant shall be executed in the manner provided by law (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden at Stateville Correctional Center, and the warden of the institution in which the defendant is confined.

*Affirmed.*