2022 IL App (2d) 210192-U
No. 2-21-0192
Order filed July 6, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20 CF 517 |
| DEON DUFF, | ) ) | Honorable Michael E. Coppedge, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Presiding Justice Bridges and Justice Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*: (1) Defendant was proved guilty beyond a reasonable doubt of (a) home invasion, where he dragged the victim inside the house where she was a guest and beat her, and (b) aggravated fleeing and attempting to elude a peace officer, where he fled the scene and led the police on a chase while driving at least 21 miles per hour above the speed limit.  (2) The trial court did not err in denying, after a preliminary inquiry, defendant's *pro se* posttrial claim of ineffectiveness, where trial counsel made a reasonable strategic decision not to pursue an individual—possibly the victim in the case—who was proposing an account of the incident that was undermined by the evidence at trial.

¶ 2   After a bench trial, defendant, Deon Duff, was convicted of home invasion (720 ILCS 5/19-6(a)(2) (West 2020)) and aggravated fleeing and attempting to elude a peace officer (625 ILCS

5/11-204.1(a)(1) (West 2020)) and sentenced to prison terms of eight and three years, respectively. On appeal, he contends that (1) he was not proved guilty beyond a reasonable doubt of home invasion; (2) he was not proved guilty beyond a reasonable doubt of aggravated fleeing or eluding; and (3) the trial court erred in denying his *pro se* claim of ineffective assistance of counsel without appointing counsel to pursue the matter. See *People v. Krankel*, 102 Ill. 2d 181 (1984). We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant was charged with the foregoing offenses and aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2020)), aggravated battery (*id.* § 12-3.05), criminal trespass to a residence (*id.* § 19-4(a)(2)), and two counts of domestic battery (*id.* § 12-3.2(a)(1), (a)(2)). The count for home invasion alleged that defendant, who was not a peace officer acting in the line of duty, entered the home of Elizabeth Jastrzebski without permission, knowing that Leticia F. was present therein, and intentionally caused injury to Leticia F. We summarize the trial evidence as pertinent to the issues on appeal.

¶ 5      Shannon Flores testified that, at about 1:30 p.m. on June 26, 2020, she was at home near Jastrzebski's home. She looked out her window and saw a man hitting a woman, who was repeatedly screaming for help. The man put the woman into a bear hug, then dragged her into Jastrzebski's building. Flores called the police. Soon, she saw the man come outside, enter a black vehicle, and drive away.

¶ 6      A tape of Flores' call was played. She related that the man hit the woman, the woman screamed for help, and the man dragged her inside. Less than a minute later, Flores stated that the man had come outside. About 45 seconds later, she said that he was getting into a black car and driving off. A woman was the passenger in defendant's car, but she was not the victim. Flores

described the man as black and wearing a white shirt. She noted that a police car chased the black car for less than a minute before driving to the vicinity of Jastrzebski's home.

¶ 7    Flores testified that, when she initially heard the victim yelling for help, she did not see the second woman outside. She did not see the two women arguing with each other. Later, however, she did see the second woman exit the building with the man. She had never seen any of the three people before.

¶ 8    Jason Billing testified as follows. He resided with Jastrzebski, his mother. On June 26, 2020, Leticia F. was in the home with them. She had been a friend of Billing's since 2011. At about 1:30 p.m., Leticia, who had been outside, was trying to run into the house. Defendant, who Billing identified in court, grabbed her by the hair and got into the house. Leticia ran into Billing's bedroom and locked the door. Defendant then challenged Billing to a fight. Jastrzebski told defendant to leave. He looked angrily at her. Jastrzebski and Billing entered her bedroom and she called the police. While in the bedroom, Billing could hear punching, *i.e.*, the sound of a hand striking flesh. He did not know who was punching whom.

¶ 9    Billing testified that, when the sound of punching ended, he and Jastrzebski left her bedroom and went into his bedroom. Leticia was on the floor near the bed. Her hair was messed up and it appeared that she had been punched several times. She said that she had a pain in her side. Billing never gave defendant permission to enter his home, and defendant never identified himself as a peace officer. Billing did not recall how defendant was dressed, but he had no police clothing on. Asked how he had known defendant before June 26, 2020, Billing testified that he had met him through Leticia.

¶ 10    Jastrzebski testified as follows. On the morning of June 26, 2020, she was at home with Billing and Leticia. She saw no injuries to Leticia. At about 1:30 p.m. Jastrzebski was on her

patio and Billing was inside the residence. About 10 to 12 feet away, Leticia was walking her dog. Jastrzebski then saw a tall black man come by and push Leticia. Leticia ran inside, the man ran inside, and then a red-haired woman went inside. Jastrzebski did not give the man permission to enter her home. Jastrzebski entered to see what was going on. Inside Billing's bedroom, she saw the man push Leticia, and she told him to get out of her home. The man started to come at Jastrzebski, but Billing got in between them. Billing and Jastrzebski went into her bedroom. She locked the door and called the police.

¶ 11 A tape of the call was played. Jastrzebski stated that a black man came into her house and was beating one of her guests. Jastrzebski said that he ran out, entered a black Audi, and drove off. Asked his name, Jastrzebski said "What's his name?" to Billing and told the person on the phone, "Deon Duff." About a minute later, as the man drove off, she said he was "DeShaun Duff." She added that the victim was safe in the residence and that Billing and a neighbor were watching her.

¶ 12 Jastrzebski testified that she did not recall telling the second woman anything. The unidentified woman was standing on the patio waiting outside while the confrontation took place, although at some point she had entered the residence. Jastrzebski did not actually see the man leave and drive off, although she told the police dispatcher that he had done so.

¶ 13 Sean Feely, a Lake in the Hills police officer, testified as follows. At about 1:30 p.m. on June 26, 2020, while on patrol in full uniform and driving a marked squad car, he was dispatched to Jastrzebski's residence, based on the reported attack. He was told that the attacker had driven away in a black Audi A4. He arrived on the scene just as the A4 was leaving.

¶ 14 Feely pursued the A4. It was registered to a woman whose name Feely could not recall. Feely's squad car had a radar system and a dashboard video camera. Near Jastrzebski's residence,

the A4 passed another vehicle. Feely activated the squad car's lights and sirens and kept them on throughout the pursuit. From the reflection in the A4's side-view mirror, Feely saw that the A4's driver was a black male wearing a white shirt. He did not see a passenger but had been advised that there was one. Feely was driving 45 miles per hour (mph) in the 25-mph zone. The A4 was going at least 55 mph. The A4 accelerated, and, although Feely was driving approximately 55 mph, the A4 was gaining distance on him. For public safety, Feely ended the pursuit after less than a minute and drove back to Jastrzebski's residence. He spoke with a woman identified as Leticia. Her arms had bruise marks and she was holding her rib area and appeared to be in pain. An ambulance took her to a hospital.

¶ 15    The video of the pursuit was played. We shall refer to its contents as needed in our analysis of the issues.

¶ 16    Amanda Schmitt, a Lake in the Hills police officer, testified as follows. At about 1:30 p.m. on June 26, 2020, she reported to Jastrzebski's residence and spoke outside with a woman named Leticia. Schmitt spoke with her again in the ambulance and photographed her injuries. The photographs were admitted into evidence. Jordan Miller, a firefighter and paramedic, testified that he and his partner drove an ambulance to Jastrzebski's residence, where they spoke outside to a woman who gave her name as "Leticia V." Inside the ambulance, Miller noticed that she had a large bruise to her ribs, bruising to her abdomen, and swelling and pain in the back of her head. She said that she had been struck and kicked.

¶ 17    The State recalled Billing. He testified that he knew both defendant and Leticia but never saw them together before June 26, 2020. He had never spoken to defendant about whether he and Leticia had ever dated.

¶ 18    The State rested.  The trial court granted defendant directed findings on the domestic battery counts and the count of aggravated battery based on great bodily harm.  Defendant put on no evidence.

¶ 19    After hearing arguments, the trial court first found defendant guilty of home invasion.  The court explained as follows. A person commits home invasion, as charged here, when (1) he is not a peace officer acting in the line of duty and (2) without authority knowingly enters the dwelling place of another (3) when he knows or has reason to know that one or more persons are present or knowingly enters the dwelling place of another and remains there until he knows or has reason to know that one or more persons are present and (4) intentionally causes any injury to any person or persons within the dwelling place.  720 ILCS 5/19-6(a) (West 2020).  The first element was undisputed.  The second element was proved by Flores's testimony that a man later identified as defendant dragged a woman into Jastrzebski's residence and the testimony of Jastrzebski and Billing that they did not give him permission to enter their home.  The third element was proved both by Flores's testimony that defendant dragged the woman into the residence and the testimony of Billing and Jastrzebski that he remained there after he knew that they and Leticia were inside.  As to the fourth element, Leticia had no visible injuries on the morning of the incident, and the photographs and the testimony of Feely, Schmitt, and Miller established that she suffered injuries after defendant entered the residence.  Further, Billing heard someone inside the residence being beaten, and the only other people there besides Jastrzebski were Leticia and defendant.

¶ 20    The court ruled out the unidentified woman as the cause of Leticia's injuries.  Flores did not testify to seeing anyone but the man drag the woman into the residence.  There was no evidence that the second woman was involved in an altercation.  Jastrzebski testified that the second woman

was waiting outside while the attack inside the residence took place. Leticia was injured inside the residence, even if part of the altercation occurred outside.

¶ 21    The court also found defendant guilty of aggravated fleeing or attempting to elude a peace officer. First, defendant was driving the A4. Flores testified that a black male drove away in a black automobile; she said on the phone that he was wearing a white shirt. Feely testified that, less than a mile from where Flores had seen the man, he pursued a black A4 being driven by a black man wearing a white shirt. Second, Feely audibly and visually signaled for the driver to stop; he sounded the siren and activated the emergency lights. Third, Feely was in full uniform and driving a marked police car that displayed illuminated oscillating, rotating, or flashing red or blue lights. Feely's testimony proved the second and third elements of the offense. Fourth, defendant willfully fled or attempted to elude Feely. The video proved that defendant must have been aware of the pursuing squad car, but he did not pull over or even reduce his speed. Fifth, defendant was traveling at least 21 mph over the posted limit. The video showed Feely's speeds, which were at times more than 21 mph over the posted limit even as the A4 gained ground on Feely. Also, Feely's testimony established that defendant was driving well over the posted speed limits.

¶ 22    After defendant's attorney filed a motion for a new trial, defendant filed a *pro se* motion. As pertinent here, it alleged that the State had tendered his attorney a potentially exculpatory document describing a voicemail message from Leticia. The document, attached as Exhibit A to the *pro se* motion, read:

> "To: Richard Behof [defendant's trial attorney]
>
> Subject: Duff

Leticia left us a voicemail that she is not a victim. She stated that the defendant was trying to stop a fight between her and another girl. Also the witness [*sic*] Elizabeth and Jason would like the case to be worked out, they would like to put this behind them. They understand if they are subpoenaed they have to come but would like to avoid a trial."

¶ 23 Defendant alleged that, "[i]nadvertently, somehow [he] came into possession to [*sic*] [Exhibit A]." He contended that Behof had been ineffective for (1) failing to locate Leticia and interview her or have an investigator do so, and (2) failing to subpoena her for the trial. He argued that Exhibit A was exculpatory and that Behof should have presented the trial court with such evidence that would have resulted in an acquittal. Defendant requested a *Krankel* hearing.

¶ 24 After denying the motion for a new trial, the trial court held a hearing on defendant's *pro se* motion. Behof stated that he had created Exhibit A after receiving a call from someone purporting to be Leticia. He discussed the matter with the prosecutors. The call followed the voicemail message referenced in Exhibit A (by how long is unclear). Behof did not assign an investigator to the matter but instead asked the caller to come to his office to give him her affidavit. He also asked for her telephone number so that he could reach her. The caller did not want to provide her number, and she never came into his office.

¶ 25 Behof explained that he did not subpoena the caller who claimed to be Leticia because "the evidence that [he] had through the police reports and speaking to the other eyewitnesses did not correlate to what [he] had." Asked by the court if he decided whether the information would be relevant to the defense, Behof said that he could not, because he did not know whether the caller was the actual victim. That was why he asked her to come to his office. When she refused to do so, Behof did not take further steps to secure her presence. The decision was "trial strategy"; as in many such cases, it was not "beneficial *** to try to have the victim come in and testify in

which [*sic*] the documents and everything else I had didn't purport and didn't substantiate what she was telling me on the phone." The materials that Behof had reviewed at the time included the written statements of Jastrzebski and Billing, the photographs of Leticia, and one of the calls to the police. In short, Behof did not believe that the person on the phone was either Leticia or was telling the truth, and so he wanted to talk to her in his office.

¶ 26 Defendant told the court that he received Exhibit A after it was disclosed in discovery and that Behof showed it to him about a month before the trial. Defendant had tried to discuss the matter with Behof, but Behof told him "not to go forward with it." Defendant told Behof that the caller's description of the incident was what had really happened. He knew that the caller was Leticia because he "actually heard through someone on the outside." He told Behof so.

¶ 27 Behof stated that he did not recall defendant ever telling him that he had heard from an outside source that the person referenced in Exhibit A was Leticia. Even had he so been informed, it would not have changed what he wanted the caller to do. Defendant had told Behof that he had just been trying to break up a fight between Leticia and the other woman.

¶ 28 The court stated as follows. Behof, the author of Exhibit A, had made a strategic decision that calling Leticia as a defense witness "might more strongly benefit the [S]tate, and based upon what has been presented to the court this morning, that is an understandable statement." The State had planned to call Leticia and had tried to subpoena her. The trial record showed that the individual on whom service was attempted, purportedly her relative, advised the State's investigator that she would not appear at trial to testify.

¶ 29 The court stated that, even had Leticia provided the testimony for which defendant hoped, the trier of fact would have heard the State's evidence contradicting her account. Flores testified that the man dragged the woman into the house; there was no evidence that the second woman was

involved in a fight; and the charge of aggravated fleeing or attempting to elude would have been unaffected. Moreover, had Leticia been available as a witness, she might have produced evidence that she and defendant had been in a relationship of some sort, thus enabling the State to avoid the directed findings on the charges of domestic battery.

¶ 30    Ultimately, the court stated, Behof's handling of the voicemail and phone call from the purported victim was a reasonable trial strategy. Thus, the preliminary *Krankel* proceeding established that further inquiry into defendant's claim of ineffective assistance was not warranted and conflict counsel need not be appointed. The court denied defendant's *pro se* motion.

¶ 31    After a hearing, the trial court sentenced defendant to concurrent prison terms of eight years for home invasion and three years for aggravated fleeing or attempting to elude. He timely appealed.

¶ 32                                II. ANALYSIS

¶ 33    On appeal, defendant first contends that the evidence did not prove him guilty beyond a reasonable doubt of either home invasion or aggravated fleeing or attempting to elude a peace officer. Before addressing the specifics of each argument, we set out the following general principles. In reviewing a claim of insufficient evidence, we ask only whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational fact finder could have found the elements of the offense proved beyond a reasonable doubt. *People v. Ward*, 154 Ill. 2d 272, 326 (1992). The fact finder is responsible for determining the witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to draw from the evidence. *People v. Hill*, 272 Ill. App. 3d 597, 603-04 (1995). It is not our function to retry the defendant. *People v. Lamon*, 346 Ill. App. 3d 1082, 1089 (2004).

¶ 34    Defendant argues that the State failed to prove one element of home invasion as charged: that he "[i]ntentionally cause[d] any injury *** to any person *** *within the dwelling place*." (Emphasis added.)  720 ILCS 5/19-6(a)(2) (West 2020).  Defendant does not contend that the evidence was insufficient to prove that he caused injuries to Leticia and that he entered Jastrzebski's home, but he contends that it did not prove that he caused any injury while he was inside the home.  He notes that Flores saw him grab and drag Leticia while they were outside and that Jastrzebski and Billing saw him enter and remain in their residence.  However, he notes that neither resident saw him contact Leticia inside.

¶ 35    As the State points out, defendant simply omits some vital evidence.  Billing testified that, while he was in Jastrzebski's bedroom, he heard punching sounds come from inside the residence. He described the sounds to be like someone striking flesh.  Aside from Billing and Jastrzebski, the only people in the residence were defendant and Leticia.  Immediately after defendant left, Billing entered his bedroom and saw that Leticia had several clear injuries that she had not had shortly before.  The trial court reasonably credited Billing as an "earwitness" to the attack and concluded that Leticia did not beat herself while defendant stood by.  This conclusion was reinforced by the evidence that defendant had abused Leticia shortly before he entered the residence and had menaced Billing with the possibility of a fight.  Defendant was proved guilty of home invasion.

¶ 36    Defendant also contends that the evidence did not prove him guilty of aggravated fleeing or attempting to elude a peace officer.  He argues that the State failed to prove that he was the driver of the black Audi A4 that Feely pursued.  He notes that Feely never stopped the A4 and, based on the video, did not have a fair opportunity to view the driver.

¶ 37    Defendant gives short shrift to the evidence, other than Feely's testimony and the video, that proved that he was the driver of the A4.  Both Flores and Jastrzebski told the police that

defendant (not the second woman) drove off in a black car, and Jastrzebski specifically stated that it was an Audi A4. (Although she apparently learned this from Billing, the trial court could still credit her statement.) A short time later, not far from Jastrzebski's residence, Feely spotted a black Audi A4 driving away from the vicinity of the attack. The video shows that the road had very little traffic. Feely saw that the driver matched the description given by Flores. Moreover, the driver eluded Feely, going far over the speed limit and refusing to pull over.

¶ 38 Even were we to arrogate the fact finder's prerogative and discredit Feely's testimony, we would still have sufficient evidence that defendant was the driver of the black Audi A4. A reasonable trier of fact did not need to entertain the possibility that some other person, driving a black Audi A4 on an almost deserted road shortly after the attack, near the scene of the attack but driving away from it, was trying to flee the police who were obviously trying to stop him. Thus, defendant was proved guilty beyond a reasonable doubt of aggravated fleeing or attempting to elude a peace officer.

¶ 39 We turn to defendant's final issue on appeal. He contends that the trial court erred in dismissing his *pro se* claim of ineffective assistance without holding more than a preliminary *Krankel* inquiry. Defendant argues that he raised a sufficient basis for the court to find possible neglect of the case by counsel and thus to appoint conflict counsel and hold a hearing. For the reasons that follow, we disagree.

¶ 40 New counsel is not automatically required in every case in which a defendant presents a *pro se* posttrial motion alleging ineffective assistance of counsel. *People v Moore*, 207 Ill. 2d 68, 77 (2003). Rather, the trial court should first examine the factual basis of the defendant's claim. The court may inquire of trial counsel, the defendant, or both, and may also rely on its own knowledge of counsel's performance at trial and the insufficiency of the defendant's allegations

on their face. *Id.* at 79. If the court determines that the claim lacks merit or pertains only to trial strategy, it need not appoint new counsel and may deny the motion. However, if the allegations show possible neglect of the case, new counsel should be appointed. *Id.* at 78.

¶ 41 Defendant does not contend that the trial court conducted the *Krankel* inquiry improperly. He contends, rather, that the court erred in deciding that he had not shown possible neglect of his case and thus that appointing new counsel was not merited. We shall not disturb the court's decision unless it was manifestly erroneous. See *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25.

¶ 42 To demonstrate ineffective assistance of counsel, a defendant must ultimately establish that (1) counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, absent counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). Although deciding whether to investigate or call a potential witness is a matter of trial strategy that is usually immune from a claim of ineffective assistance, such a claim can be based on a strategic decision that was objectively unreasonable. *People v. Lawson*, 2019 IL App (4th) 180452, ¶¶ 47-48. An attorney must make a reasonable investigation or make a reasonable claim that a particular investigation is not necessary. *People v. Domagala*, 2013 IL 113688, ¶ 38. Nonetheless, in matters of trial strategy, we must give considerable deference to counsel's judgment. *People v. Guest*, 166 Ill. 2d 381, 400 (1995).

¶ 43 Defendant argues that Behof (1) "failed to investigate [his] claim" and (2) neglected the claim by deciding neither to send an investigator to pursue the matter nor to subpoena Leticia to testify for the defense at trial. We believe that the first assertion is inaccurate and the second

assertion, while accurate, does not show possible neglect of the case. Under all the circumstances, Behof's decisions supported a reasonable strategy.

¶ 44    We explain first that Behof did not fail to investigate defendant's claim that Leticia could help his case at trial. After receiving the voicemail message, Behof recorded its contents. When a person called purporting to be Leticia, he requested that she come to his office to complete an affidavit, and he also requested her telephone number. Both of these requests demonstrated an active pursuit of the claim. By appearing at his office, the purported victim would enable Behof to discover whether she was indeed Leticia, and, if she passed this initial test, to obtain an affidavit to enable him to decide whether her testimony would be credible and potentially helpful to the defense. This decision would depend in part upon an evaluation of what she might say on cross-examination, especially given that she was the alleged victim and the State had hoped to call her as the most important occurrence witness. Disclosing her telephone number would help Behof pursue the matter after she met him personally or, if she declined to do so, would enable him to contact her in an attempt to keep the investigation alive. However, the purported victim both declined to provide her number *and* never came to his office. To the extent that Behof "failed" to investigate defendant's claim, it was only because the purported victim intentionally frustrated his efforts to do so.

¶ 45    Nonetheless, defendant maintains that Behof should have sent an investigator or issued a subpoena to accomplish what an earlier investigator had failed to do—find Leticia and serve her with a subpoena to testify at trial. Although this was an available option, for the following reasons, we surely cannot say that Behof's decision not to do so was objectively unreasonable. These reasons go beyond a probable futile effort to find someone who had repeatedly made every effort not to be found.

¶ 46    First, because of the purported victim's reticence, Behof had no assurance that Leticia had actually left the allegedly exculpatory voicemail on his phone. Second, even assuming she had, he had every reason to believe that her testimony would not aid the defense at trial.  Intuitively, it makes little sense to believe that the victim of a charged offense, whom the State had hoped to call as its star witness, would help the defense.  It did not help that the purported victim's refusal to come forth and cooperate with Behof made it impossible for him to inquire into the factual basis for her claim that defendant did not commit the offense (at least as charged).  Had he successfully subpoenaed Leticia, nothing would be guaranteed, except for the likelihood that the State would also be able to find her and investigate her claim as well.

¶ 47    More specifically, given the available discovery, as manifested in the evidence presented at trial, Behof had every reason to believe that obtaining Leticia's testimony would vindicate the adage, "Be careful what you wish for—you may get it."  At the preliminary *Krankel* hearing, Behof explained that defendant's claim that he was merely breaking up a fight between Leticia and the second woman was unsupported by any evidence at trial.  Flores, Jastrzebski, and Billing all testified to facts that contradicted it.  Notably, defendant apparently made no effort to obtain the testimony of the second woman that there was such a fight.  Moreover, Leticia's serious injuries, which necessitated a trip to the hospital while the second woman rode off with defendant, cut against the fight theory.  Even assuming that Leticia would show up, testify, and testify as defendant hoped, Behof reasonably concluded that cross-examination would have shredded her story and left defendant in a worse position than otherwise.

¶ 48    We cannot say that the trial court manifestly erred in concluding that defendant failed to show possible neglect by his counsel such that appointing new counsel was necessary.  Therefore, we reject defendant's final claim of error.

¶ 49                              III. CONCLUSION

¶ 50    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 51    Affirmed.