NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230239-U

NO. 4-23-0239

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 1, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| SHERRY D. JEFFERSON, | ) | No. 22CM377 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer M. Ascher, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justice Turner and Justice Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed, concluding (1) the evidence was sufficient to sustain defendant's conviction for violation of a stalking no contact order and (2) defendant established no clear or obvious error related to the trial court's refusal to grant her a continuance.

¶ 2    Following a bench trial, defendant, Sherry D. Jefferson, was found guilty of violation of a stalking no contact order and sentenced to 2 years' probation, with 180 days in jail stayed. Defendant appeals, arguing (1) the State failed to prove her guilty beyond a reasonable doubt and (2) the trial court erroneously denied her motion for a continuance to secure the presence of a witness. For the reasons that follow, we affirm.

¶ 3                          I. BACKGROUND

¶ 4                          A. Charges

¶ 5    In July 2022, the State charged defendant with two counts of violation of a stalking

no contact order (740 ILCS 21/125 (West 2022)). In support of the charges, the State alleged, on July 18, 2022, defendant, having been previously served with notice of a stalking no contact order issued in Sangamon County case No. 21-OP-1954, did knowingly commit acts prohibited by the order, in that she (1) was within 500 feet of Nicole Hill (count I) and (2) harassed Hill by yelling at her (count II).

¶ 6                     B. Subpoena of a Defense Witness

¶ 7        In January 2023, the trial court scheduled a bench trial for February 2023. Thereafter, the defense subpoenaed Keyanna Harris to testify at the trial. On the day of the scheduled trial, the State moved for a continuance, which the court granted over the objection of the defense. By court order, all subpoenas were extended to the date of the rescheduled bench trial.

¶ 8                     C. Bench Trial

¶ 9        In March 2023, the trial court conducted the rescheduled bench trial. At the commencement of the proceeding, the court inquired about any motions. The only motions addressed by the parties concerned excluding persons from the courtroom. After addressing the pending motions, the court proceeded with the trial.

¶ 10       In its case, the State initially moved to admit a stalking no contact order issued in case No. 21-OP-1954, which the trial court granted over no objection. The order indicates it was issued against defendant on November 24, 2021, and was in effect until November 22, 2023. The order also indicates defendant was personally served with a copy of the order in open court on November 24, 2021. The order imposed, amongst other things, the conditions that defendant (1) stay at least 500 feet away from Hill and (2) not contact Hill in any way. With respect to the latter, the order specifically imposed the condition "[t]hat [defendant] may not contact [Hill] in any way, directly, indirectly or through third parties, including, but not limited to, phone, written

notes, mail, email, or fax." A general definitions page attached to the order defines "contact" as follows:

> "Contact: includes any contact with the victim, that is initiated or continued without the victim's consent, or that is in disregard of the victim's expressed desire that the contact be avoided or discontinued, including but not limited to being in the physical presence of the victim; appearing within the sight of the victim; approaching or confronting the victim in a public place or on private property; appearing at the workplace or residence of the victim; entering onto or remaining on property owned, leased or occupied by the victim; or placing an object on, or delivering an object to, property owned, leased, or occupied by the victim."

¶ 11 Following the admission of the stalking no contact order, the State called Hill as a witness. On direct examination, Hill testified she obtained the stalking no contact order issued against defendant in late 2021. Hill noted defendant was previously married to Hill's father, and she and defendant had "never gotten along."

¶ 12 Hill testified about an incident involving defendant on July 18, 2022, at a local market. That day, Hill drove to the market for lunch. Upon parking her vehicle and approaching the market's entrance on foot, Hill noticed defendant "walking *** about seven steps behind me," at which time they made eye contact. Hill entered the market, ordered something to eat, and then returned to her vehicle, looking for a debit card. Hill returned to the market to pay for her food. Upon her return, Hill noticed defendant was at the back of the checkout line, with a "few people" between them. Hill paid for and received her food and then returned to her vehicle. She sat inside

- 3 -

her vehicle and sent text messages and made a phone call on her cell phone.

¶ 13    While in her vehicle, Hill saw defendant exit the market and walk in front of Hill's vehicle. Defendant dropped off some items at defendant's vehicle and then approached the window of Hill's vehicle. Hill testified defendant started yelling Hill's name when she was within arm's length of her. Hill "rolled [her] window down a little bit" to ask what defendant wanted. After Hill began to open her window, defendant backed away. Hill explained the following occurred when defendant was about a car length away from her:

> "[S]he started yelling that she hated me, she hated my mom, she
> wished I was dead, she was glad my mom was dead. My mom was
> a crackhead, I am a crackhead[,] and that she was going to beat me
> up. She can't wait to beat me up."

Hill tried to find "a voice recorder" application on her cell phone. She kept typing in "recorder" but could not find the application. She then started backing her vehicle out of the parking spot, at which point "a crowd started forming." Defendant went to the crowd and told them that Hill and Hill's mother were "crackhead[s]" and that she wanted "to beat [Hill] up." Eventually, Hill, while backing out, was able to pull up a video recording application on her phone.

¶ 14    Hill testified she began making an audio and video recording on her cell phone while "rolling forward *** very slowly." At that point, Hill explained, defendant approached Hill's vehicle and yelled at her. The State moved to admit the recording taken from Hill's cell phone, which the trial court granted over no objection. In the 24-second recording, Hill's vehicle initially appears perpendicular to defendant's parked vehicle and proceeding forward at a slow speed. Defendant, who was approximately 12 to 15 feet away from Hill, can be seen initially standing just behind the rear driver's side door of defendant's vehicle and pointing at Hill with one hand

and holding a bag in her other hand. Defendant can be heard yelling, "Stop blocking my car, b***. Move from behind my car, b***." Defendant eventually turns around, proceeds towards an opened front driver's side door of her vehicle, sits down, and then turns her body back towards Hill's vehicle, which continues to proceed forward. At that point, defendant can be heard yelling, "Quit blocking my car. Quit blocking my car. Why you filming? Let them know you blocking my car, b***." Following these comments, Hill states, "Nobody is blocking your car. I'm clearly rolling." The recording then ends. Hill testified she continued forward after the recording ended and left the scene. Before leaving, she noticed defendant speak with someone who was inside her vehicle about Hill and then speak with the others in "the crowd." Approximately five minutes after the incident, Hill called the police from another location. She then spoke with a police officer at that location.

¶ 15    On cross-examination, Hill acknowledged she stayed in the parking lot despite knowing defendant would eventually leave the market. Hill explained she believed the stalking no contact order would protect her against defendant "coming to me saying anything to me at all." Hill maintained her vehicle was constantly moving when it was behind defendant's vehicle. Hill testified she did not inform the police officer of any contact with defendant inside the market.

¶ 16    On redirect examination, Hill explained her vehicle was moving slowly behind defendant's vehicle because she was trying to get video evidence of defendant's conduct and did not want to cause an accident. When asked if she blocked in defendant's vehicle, Hill testified, "You can see I am clearly moving. My vehicle was moving the entire time. The shaking that you're seeing is my car moving."

¶ 17    Following the elicitation of testimony from Hill and the admission of the audio and video recording taken from Hill's cell phone, the State called police officer Matthew Torres as a witness. On direct examination, Officer Torres testified he met with Hill on July 18, 2022, about

- 5 -

an incident at a local market involving defendant. Hill reported defendant "started harassing her inside the store as well as outside the store." Hill also showed Officer Torres an audio and video recording on her cell phone of defendant yelling at her. Officer Torres was then dispatched to another location to speak with defendant "about a vehicle blocking her vehicle." Upon arriving at that location, defendant reported Hill blocked her vehicle at the market. Defendant acknowledged she was aware of the stalking no contact order entered against her and she had yelled at Hill to move her vehicle. The State moved to admit an audio and video recording taken from Officer Torres's body camera of the interaction between Officer Torres and defendant, which the trial court granted over no objection.

¶ 18    On cross-examination, Officer Torres acknowledged a woman who can be seen in the audio and video recording taken from his body camera indicated she was related to defendant and was at the market with her. Officer Torres testified he did not mention the woman as a witness in his police report because she was "a biased witness" and because she said "she wasn't paying attention." He also did not "take [the woman's] statement." Officer Torres acknowledged he did not go to the market to look for additional witnesses or evidence of the interaction between Hill and defendant.

¶ 19    On redirect examination, Officer Torres testified the woman related to defendant did not approach him and ask to make a written statement.

¶ 20    Following the elicitation of testimony from Officer Torres and the admission of the audio and video recording taken from Officer Torres's body camera, the State rested its case.

¶ 21    The defense, in its case, called defendant as a witness. On direct examination, defendant testified, on July 18, 2022, she went to a local market for lunch. Her cousin, Harris, went to the market with her. Upon entering the checkout line at the market, defendant became aware of

Hill's presence inside the market. At that point, she saw Hill by the counter, approximately four or five people in front of defendant, receiving her food. Hill then left the market, and defendant remained in the line.

¶ 22      Defendant estimated she reached the front of the checkout line and paid for her items approximately five to seven minutes after Hill left the market. Defendant initially testified she "waited a few minutes" for Harris, who was at least one person behind her in the line, to pay for her items before leaving the store. She later testified she left the market upon paying for her items but then returned upon seeing Hill outside and waited for Harris to pay for her items.

¶ 23      Upon exiting the market, defendant saw Hill inside a vehicle. Defendant asserted Hill was using her vehicle to block in defendant's vehicle. Defendant also asserted Hill initiated a conversation with her. When asked what Hill said to her, defendant testified, "An OB." Defendant "asked [Hill] to move" her vehicle. Defendant then walked to her vehicle with Harris.

¶ 24      Defendant testified Hill's vehicle remained behind her vehicle "[f]or a while because I called police and I waited." When asked if she called the police before the recording was taken of her yelling at Hill, defendant testified, "Uh-huh." Defendant requested the police meet her at another location, a location where she needed to be for work after her lunch break.

¶ 25      Eventually, Hill, defendant, and Harris left the market. Defendant then spoke with a police officer at another location.

¶ 26      On cross-examination, defendant acknowledged the stalking no contact order entered against her prohibited her from both being within 500 feet of Hill and having any contact with Hill. Defendant believed her yelling at Hill was appropriate because Hill had blocked her vehicle and she needed to get back to work. Defendant testified she did not walk towards Hill or approach Hill's vehicle.

¶ 27      Following the elicitation of testimony from defendant, the defense noted its final witness, Harris, was not present. Because the defense believed Harris was "very important" to its case, it made an oral motion for a continuance to secure the presence of Harris. The trial court, in response, indicated it needed to hear "what the nature of the testimony would be," noting it was "struggling as to how this witness is going to help [it] make a decision[ ] given the testimony that's already been presented." The defense then gave the following proffer:

> "[Harris], the witness who was in the video also at the store came and gave a report to our secretary basically stating and confirming [defendant's] side of [the] story that they were in the store, had no idea—had no idea that [Hill] was—was in [the] store. They came in before [Hill] ever went in the store.
>
> That [Hill] picked up her food and left. That there was a long time that passed between her leaving and them exiting the store. She gave a 20 minute estimate. She said that when they finally left the store—basically, when they finally left the store that [Hill] started yelling profanities. That she had [defendant's] car blocked in. That she did not move her car immediately[,] the car was stopped.
>
> She confirmed that [defendant] also called police. She would also state that she wanted to give a statement to the police, the police did not take one. She said that she asked the police officers to be able to give a statement and they didn't take one."

The court, after hearing the proffer, denied the motion. The defense then rested its case.

¶ 28      In closing, the defense argued the State failed to prove defendant committed an act

prohibited by the stalking no contact order. With respect to count II, the defense asserted the stalking no contact order prohibited contact that was "initiated or continued without the victim's consent" and the evidence showed Hill initiated the contact with defendant by either not driving away after leaving the market or by "sitting behind my client's car." The defense argued Hill was attempting to use the stalking no contact order "as a weapon" against defendant.

¶ 29      After considering the evidence and arguments presented, the trial court found the State had met its burden of proof only with respect to count II. As to that count, the court focused on the contact shown in the audio and video recording taken from Hill's cell phone. The court acknowledged contact had been defined as "any contact that's initiated or continued without the victim's consent." The court found "[c]onsent stopped *** when the [stalking no contact order] was entered." The court continued:

> "And I don't find that Ms. Hill in [any] way, shape, or form initiated
>
> or requested contact by [defendant]. Quite frankly, I think it is
>
> absolutely the opposite."

In reaching its findings, the court characterized Hill as (1) "a more credible witness than [defendant]," (2) "very credible," and (3) "extremely credible."

¶ 30                          D. Sentencing Hearing

¶ 31      Immediately following the bench trial, the trial court conducted a sentencing hearing. The court sentenced defendant to two years' probation, with 180 days jail stayed.

¶ 32      This appeal followed.

¶ 33                              II. ANALYSIS

¶ 34      On appeal, defendant argues (1) the State failed to prove her guilty beyond a reasonable doubt of violation of a stalking no contact order and (2) the trial court erroneously

denied her motion for a continuance to secure the presence of Harris. The State disagrees with each of defendant's arguments.

¶ 35                                    A. Sufficiency of the Evidence

¶ 36          Defendant argues the State failed to prove her guilty beyond a reasonable doubt of violation of a stalking no contact order. Specifically, defendant asserts the trial court misconstrued the pertinent act prohibited by the stalking no contact order and, had it been properly construed, no rational trier of fact could have found her contact with Hill on July 18, 2022, exceeded the bounds of Hill's consent.

¶ 37          When presented with a challenge to the sufficiency of the evidence, the question is "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the required elements of the crime beyond a reasonable doubt." *People v. Galarza*, 2023 IL 127678, ¶ 25, 216 N.E.3d 834. The trier of fact remains responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts. *Id.* "A criminal conviction will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876.

¶ 38          In this case, defendant was convicted of violation of a stalking no contact order. A person commits violation of a stalking no contact order if, in relevant part, that person knowingly commits an act prohibited by a court in a valid stalking no contact order after having been served with notice of the contents of the order. 740 ILCS 21/125 (West 2022); 720 ILCS 5/12-3.9 (West 2022).

¶ 39          Defendant initially asserts the trial court misconstrued the pertinent act prohibited by the stalking no contact order by finding any contact between defendant and Hill was prohibited.

We reject defendant's assertion. While the court found "[c]onsent stopped *** when the [stalking no contact order] was entered," it then, based upon the argument presented by the defense, considered and rejected the assertion that contact was initiated by Hill on July 18, 2022. Specifically, the court acknowledged contact had been defined as "any contact that's initiated or continued without the victim's consent." The court then found Hill did not "in [any] way, shape, or form initiate[ ] or request[ ] contact by [defendant]," and "[q]uite frankly, I think it is absolutely the opposite." The court, therefore, construed the pertinent act prohibited by the stalking no contact order as the defense had argued—an act of contact that exceeded the bounds of Hill's consent on July 18, 2022.

¶ 40        Defendant also asserts no rational trier of fact could have found her contact with Hill on July 18, 2022, exceeded the bounds of Hill's consent. We reject defendant's assertion. Hill, who the trial court found "extremely credible," provided an account of July 18, 2022, in which defendant, without any prior engagement from Hill, approached Hill's vehicle and yelled at her. Hill's account was corroborated, at least in part, by the audio and video recording taken from Hill's cell phone. Defendant, on appeal, essentially asks this court to conduct a retrial and find her account more credible. That is not this court's function. *People v. Cline*, 2022 IL 126383, ¶ 33, 193 N.E.3d 1220. Viewing the evidence in the light most favorable to the State, we find a rational trier of fact could have found defendant's contact with Hill on July 18, 2022, exceeded the bounds of any consent.

¶ 41        Accordingly, we find, absent any other argument, the evidence is sufficient to sustain defendant's conviction for violation of a stalking no contact order.

¶ 42                B. Ruling on Defendant's Motion for a Continuance

¶ 43        Defendant argues the trial court erroneously denied her motion for a continuance to secure the presence of Harris. Specifically, defendant asserts the court failed to consider any relevant factor in denying her motion and, had all relevant factors been properly considered, any denial under the circumstances of this case would amount to an abuse of discretion.

¶ 44        At the outset, defendant acknowledges her claim of error was not properly preserved and, therefore, requests it be considered as a matter of second-prong plain error. See *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675 ("To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion."). Under the second prong of the plain-error doctrine, a reviewing court may consider an unpreserved claim of error when (1) "a clear or obvious error occurred" and (2) "the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Schoonover*, 2021 IL 124832, ¶ 27, 190 N.E.3d 802. The defendant bears the burden of persuasion in establishing plain error. *People v. Hartfield*, 2022 IL 126729, ¶ 50, 202 N.E.3d 890.

¶ 45        The initial question for this court under the plain-error doctrine "is whether a clear or obvious error occurred." *Schoonover*, 2021 IL 124832, ¶ 30. After a trial has begun, "a reasonably brief continuance may be granted to either side in the interests of justice." 725 ILCS 5/114-4(f) (West 2022). The decision to grant or deny a motion for a continuance is "within the sound discretion of the trial court, and its ruling will not be reversed on appeal in the absence of a clear abuse of that discretion." *People v. Ward*, 154 Ill. 2d 272, 307, 609 N.E.2d 252, 266 (1992). "An abuse of discretion occurs only where the *** ruling is arbitrary, fanciful, or so unreasonable that no reasonable person could take the *** court's view." *People v. Cross*, 2022 IL 127907, ¶ 24, 215 N.E.3d 953.

¶ 46　　　　In *Ward*, 154 Ill. 2d at 307, our supreme court set forth three factors for consideration when reviewing the denial of a motion for a continuance to secure the presence of a witness: "(1) whether defendant was diligent; (2) whether defendant has shown that the testimony was material and might have affected the jury's verdict; and (3) whether defendant was prejudiced." More recently, the court, in *People v. Walker*, 232 Ill. 2d 113, 125-26, 902 N.E.2d 691, 697 (2009), set forth several factors a trial court "*may* consider in determining whether to grant a continuance request by a defendant in a criminal case." (Emphasis added.) Those factors include: (1) the movant's diligence; (2) the defendant's right to a speedy, fair, and impartial trial; (3) the interests of justice; (4) counsel's lack of preparedness and the reasons therefore; (5) the history of the case; (6) the complexity of the matter; (7) the seriousness of the charges; (8) docket management; (9) judicial economy; and (10) the inconvenience to the parties and witnesses. *Id*. In *Walker*, the court reiterated " '[t]here is no mechanical test *** for determining the point at which the denial of a continuance in order to accelerate the judicial proceedings violates the substantive right of the accused to properly defend.' " *Id.* at 125 (quoting *People v. Lott*, 66 Ill. 2d 290, 297, 362 N.E.2d 312, 315 (1977)).

¶ 47　　　　Defendant initially asserts the trial court failed to consider any relevant factor in denying her motion for a continuance, demonstrating a complete absence of an exercise of its discretion. See *id.* at 126 (finding the record established a complete failure to exercise discretion where it was devoid of evidence showing the consideration of any relevant factor in denying the motion for a continuance). We reject defendant's assertion. The record shows the court considered the materiality of Harris's testimony in ruling on the motion. Specifically, the court, in response to defendant's motion and after having heard the testimony of Hill, Officer Torres, and defendant, indicated it needed to hear "what the nature of [Harris's] testimony would be," noting it was

"struggling as to how this witness is going to help [it] make a decision[ ] given the testimony that's already been presented." After hearing the proffer, the court denied defendant's motion. From this record, we find it is evident the court found Harris's testimony was not sufficiently material to warrant a continuance to secure her presence, an exercise of its discretion.

¶ 48    Defendant also asserts, to the extent the trial court exercised its discretion, that exercise amounted to a clear abuse of its discretion upon a proper consideration of all relevant factors. We reject defendant's assertion. Again, the court found Harris's testimony was not sufficiently material to warrant a continuance to secure her presence. Harris would have provided an account consistent with defendant's and testified "that she asked the police officers to be able to give a statement and they didn't take one." Initially, Harris's testimony about giving a statement would have conflicted with the testimony of Officer Torres. Moreover, Officer Torres testified Harris stated "she wasn't paying attention." In any event, the court, as the trier of fact, ultimately found Hill to be "extremely credible" and "absolutely" did not initiate or request contact with defendant. We are not convinced the testimony of Harris, even if she had testified consistent with the proffer, might have affected the verdict. On this basis alone, we cannot say the court's decision amounted to a clear abuse of its discretion. See *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 83, 35 N.E.3d 1156 (finding the trial court did not abuse its discretion in denying the motion for a continuance where the defendant failed to show the testimony was material and might have affected the verdict).

¶ 49    Accordingly, we find defendant has established no clear or obvious error. We, therefore, need not proceed further in our analysis under the plain-error doctrine.

¶ 50                                III. CONCLUSION

¶ 51    We affirm the trial court's judgment.

¶ 52        Affirmed.